Matthew J. SERRA

v.

**FORD MOTOR CREDIT COMPANY
et al.[1]**

No. 80–501–Appeal.

Supreme Court of Rhode Island.

July 13, 1983.

1. The codefendant in this case is Colony Ford Truck Sales, the agent of Ford Motor Credit Co. For the sake of clarity we shall refer only to a singular defendant throughout this opinion.

Natale L. Urso, Mary Urso, Westerly, for plaintiff.

Kathleen Sullivan Murray, Providence, for defendants.

· OPINION

WEISBERGER, Justice.

This is an appeal from a judgment in the Superior Court ordering the defendant to return an automobile to the plaintiff and to pay nominal compensatory and punitive damages. On appeal, the defendant challenges the trial justice's findings concerning the possessory rights of the parties in respect to the automobile, his denial of the defendant's midtrial motion to amend its answer to add a counterclaim, and his award of punitive damages. The facts that gave rise to the present controversy are as follows.

In January 1979 plaintiff, Matthew J. Serra (Serra), purchased a 1979 Lincoln Continental Mark V from Suburban Ford Lincoln Mercury (Suburban). Serra financed this purchase by trading in a used car, paying a portion of the purchase price in cash that he borrowed from a bank, and agreeing to pay the balance before taking possession of the Lincoln. Even though the car remained on the premises of the dealership, Serra obtained a title certificate, registered the car, and paid the required sales tax.

Prior to this transaction, Suburban had entered into a wholesale-financing agreement with defendant, Ford Motor Credit Company (Ford Credit). This agreement enabled Suburban to stock its new car inventory by using funds that Ford Credit supplied. In return, Ford Credit received a security interest[2] "in all such merchandise now owned or hereafter acquired" by the dealer and in the proceeds from sales of Suburban's inventory and the other listed items of collateral. The parties simultaneously entered into a capital-loan-security agreement, under which Ford Credit provided working capital to Suburban. The dealer's inventory and the proceeds thereof were among the items of collateral listed in this agreement. Ford Credit filed a Uniform Commercial Code (UCC) financing statement with the office of the Secretary of State for both the wholesale-financing agreement and the capital-loan-security agreement.

At the time Serra purchased the Lincoln in January 1979 Suburban was still bound by the terms of the wholesale-financing agreement. The final payment under the capital-loan-security agreement came due the previous fall. Apparently Suburban did not fully repay this loan because on April 13, 1979, Suburban and Ford Credit executed an agreement entitled "supplement to capital loan security agreement." This agreement obliged Suburban to repay the outstanding balance on the original capital-loan-security agreement and an additional loan over the course of approximately two years. According to the terms of the supplemental agreement, the same items that were used to secure the original capital loan served as collateral for the supplemental loan. These items included Suburban's inventory and proceeds from the sale of that inventory.

Serra intended to store his Lincoln for several years without driving it because it was one in a collectors' series. He had no room in his garage, however, so Suburban agreed to keep it on its lot. The car remained there from a date in January 1979 until sometime in the early spring of 1980. At that time, Ford Credit repossessed Suburban's entire inventory because the dealership had defaulted under the whole-sale-financing agreement. Subsequently, Suburban was placed into receivership.

In April 1980 an accident involving the car that Serra drove regularly caused him to seek delivery of the Lincoln. When Serra arrived at Suburban, he learned that the car had been driven to a barn in Connecticut owned by the dealership's president. Despite assurances from the president and Serra's willingness to pay the money that he still owed on the Lincoln, his efforts to take delivery were fruitless. Eventually, the car was transported to defendant's agent, Colony Ford Truck Sales (Colony).

Thereupon, Serra filed a complaint in the Superior Court alleging that Ford Credit and Colony were wrongfully in possession of the Lincoln. The complaint was accompanied by a motion for issuance of writ of replevin. Thereafter, the parties agreed to a conditional dismissal of the complaint. On May 6, 1980, a Superior Court justice ordered defendant to return the Lincoln to plaintiff upon plaintiff's payment of $2,844.76, the amount that the court found was still due on the Lincoln. The plaintiff, however, did not comply with this order. The defendant therefore moved that the order be set aside and that the case be placed on the nonjury trial calendar. A Superior Court justice granted this motion.

A nonjury trial resulted in judgment for plaintiff on July 3, 1980. The defendant was ordered to return the Lincoln to plaintiff within a week from the time of the judgment. In addition, the Superior Court judgment ordered defendant to pay nominal compensatory damages and $2,500 punitive damages. While filing a notice of appeal to this court, defendant also moved

---

**2.** The documentation in this case technically provides that Ford Motor Credit Company received a purchase money security interest; however, for the purposes of resolving the issues contained herein, it is sufficient to refer to defendant's interest as a security interest.

that the Superior Court stay the portion of the judgment that ordered the return of the Lincoln to plaintiff. Although a justice of the Superior Court granted defendant's motion on a temporary basis on August 1, 1980, after a hearing another justice denied the motion approximately two weeks later.

On appeal, defendant contends that the trial justice erred in several respects. We summarize these contentions as follows. The defendant asserts that the trial justice's denial of defendant's midtrial motion to amend its answer to add a counterclaim constitutes an abuse of discretion. Next, defendant contends that the trial justice erred when determining the parties' possessory rights in the Lincoln. In essence, this contention is twofold: that the trial justice incorrectly found that plaintiff was a buyer in the ordinary course of business and that defendant had not perfected its security interest in Suburban's inventory. Lastly, defendant claims that the trial justice abused his discretion when he awarded punitive damages because the trial justice misconceived material evidence in concluding that defendant's conduct was willful, reckless and malicious. Although we have set forth these assertions in the order in which they appear in defendant's brief, we shall address the issue concerning the parties' possessory rights in the Lincoln first. We shall then address the propriety of the trial justice's ruling concerning defendant's midtrial motion to amend its answer and the trial justice's award of punitive damages.

I

At trial, defendant attempted to prove that its possession of the Lincoln was consistent with its rights as a secured creditor under the wholesale-financing and capital-loan-security agreements that defendant and Suburban had executed. The defendant introduced both documents into evidence. In addition, defendant introduced a certified copy of two financing statements that covered both agreements. Financing statements are required to "perfect" securi-

ty interests under G.L.1956 (1969 Reenactment) § 6A–9–302, as amended by P.L. 1979, ch. 172, § 4.

The plaintiff did not seriously contest defendant's assertion of a perfected security interest in Suburban's inventory. Instead, plaintiff contended that his possessory rights to the Lincoln were superior to any security interest of defendant in the vehicle because he had purchased the car from Suburban as a buyer in the ordinary course of business. Such a buyer "takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." Section 6A–9–307(1).

The general definitional section of the UCC defines buyer in the ordinary course of business as

"a person who in good faith and without knowledge that the [sale] to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *." Section 6A–1–201(9), as amended by P.L.1979, ch. 172, § 1.

According to the 1972 and 1978 comment to § 6A–9–307, a combined reading of § 6A–1–201(9) and § 6A–9–307(1)

"results [in] the buyer [taking] free if he merely knows that there is a security interest which covers the goods but [taking] subject if he knows, in addition, that the sale is in violation of some term in the security agreement not waived by the words or conduct of the secured party."

The primary piece of evidence that plaintiff introduced to establish his super-priority status as a buyer in the ordinary course of business was the title certificate that Suburban had issued in plaintiff's name in January 1979. Under the motor vehicle laws of this state a title certificate is prima facie evidence that the party named on the certificate owns the vehicle to which it applies. *See* G.L.1956 (1982 Reenactment) § 31–3.1–7(d). As further proof that he was a buyer in the ordinary course of business, plaintiff introduced into evidence a

registration and title application, the dealer's statement of sale, a private-passenger-car registration card, license plate "green tags," and documents indicating that plaintiff had financed a portion of the purchase through a bank.

The defendant did not attempt to controvert this evidence directly. Rather, defendant introduced into evidence the dealer's vehicle invoice for the transaction at issue. The invoice indicated that plaintiff still owed a substantial sum to the dealer for the purchase of the Lincoln at the time the dealer supplied him with the title certificate. Furthermore, one of defendant's witnesses, Mr. James DeMarco (DeMarco), who was general manager of the dealership at the time of the transaction, testified that the vehicle invoice disclosed a written agreement between plaintiff and Suburban for the purchase of the Lincoln but that plaintiff agreed not to take delivery of the vehicle until he paid the outstanding balance and settled his other accounts with Suburban.

DeMarco testified that he did not give plaintiff the certificate of title and that the registration was kept in the dealership's files because DeMarco did not want plaintiff to have the car or the registration until he paid the money that he owed. DeMarco characterized this procedure as consistent with ordinary business practices. During cross-examination, DeMarco speculated that someone else must have given the title certificate to plaintiff and testified that he did not learn that plaintiff had registered the car until after the registration had been completed. Apparently, through the invoice and DeMarco's testimony defendant was attempting to demonstrate that plaintiff was not a buyer in the ordinary course of business because the transaction between plaintiff and Suburban was so incomplete that plaintiff could not be a buyer and the transaction could not be a sale in the ordinary course.

The trial justice determined that the title certificate was sufficient to establish plaintiff's ownership of the Lincoln. Next, after reciting the definitional language contained in § 6A–1–201(9), the trial justice found that plaintiff bought the vehicle in the ordinary course of Suburban's business. The court therefore held that plaintiff's possessory rights in the Lincoln were superior to those of defendant regardless of whether or not defendant's security interest was perfected.

Nonetheless, the trial justice concluded that the security interest could not be perfected by filing a financing statement that is drafted

> "in general terms [and] that does not list the particular items by serial number or any means or method by which the general public could identify those particular items * * *."

Furthermore, the trial justice found that a financing statement containing "language * * * that [the] financing statement covers the following types or items of collateral now owned or hereafter acquired by the debtor" could not perfect a security interest in a 1979 automobile when the statement was filed in 1977. The trial justice based this finding on the conclusion that a statute authorizing such a security interest would be unconstitutional because *it would enable* defendant to deprive plaintiff of his property "without due process of law."

■ The defendant contends that the findings of the trial justice concerning the parties' possessory rights in the Lincoln were erroneous. A trial justice's decision in a nonjury civil or criminal case is entitled to great weight if it "reasonably indicates that he exercised his independent judgment in passing on the weight of the testimony and the credibility of the witnesses * * *." *In re Susan*, R.I., 411 A.2d 296, 299 (1980). We shall not disturb the trial justice's decision in this case unless the record indicates that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *See, e.g., Hayes v. Plantations Steel Co.*, R.I., 438 A.2d 1091, 1094 (1982); *Altieri v. Dolan*, R.I., 423 A.2d 482, 484 (1980); *LaPorte v. Ramac Associates, Inc.*, 121 R.I. 82, 85–86, 395 A.2d 719, 721 (1978).

■ Applying these standards of review, we hold that the trial justice erred when he found that defendant's security interest in Suburban's inventory had not been perfected. We agree with defendant's assertion that the trial justice improperly applied the outmoded "serial number" test when determining the effect of the financing statements that defendant filed.[3]

Section 6A–9–110 provides that a description of personal property contained in a financing statement "is sufficient whether or not it is specific if it reasonably identifies what is described." The comment to this section of the UCC suggests that courts interpret the section as discarding the "serial number" test.

The trial justice found that the "general terms" of the financing statement violated the "purpose and thrust of the Uniform Commercial Code." The terms to which he was referring provided that the financing statement covered certain "types (or items) of collateral now owned or hereafter acquired by [the debtor]." Among these items were the dealer's inventory and accounts receivable. In addition, the statement covered the proceeds of the listed collateral. Certainly, this description was adequate to identify the collateral reasonably.

■ Similarly, the trial justice erred in finding that a financing statement filed in 1977 could not perfect a security interest in a 1979 automobile. Chapter 9 expressly allows a creditor to secure obligations covered by a security agreement by attaching collateral that the debtor will obtain in the future. Section 6A–9–204(1), as amended by P.L.1979, ch. 172, § 4. An automobile that a dealer acquires and holds as inventory is among the types of collateral to which such an after-acquired property clause may apply. *See* § 6A–9–204(2).

The stated policy of the UCC is that the code should be "liberally construed and applied to promote its underlying purposes and policies." Section 6A–1–102(1). The code states that one of these purposes and policies is "[t]o simplify, clarify and modernize the laws governing commercial transactions * * *." Section 6A–1–102(2). The restrictive and narrow construction of § 6A–9–110 that the trial justice adopted was inconsistent with this goal. We hold therefore that the trial justice was wrong as a matter of law in finding that defendant had not perfected its security interest in Suburban's inventory, including the 1979 Lincoln, by filing financing statements in 1977, each of which contained an after-acquired property clause. Moreover, we find that these statements perfected defendant's security interest in all of the types and items of collateral listed on these statements and the proceeds of that collateral.

[5] Having determined that a perfected security interest attached to the 1979 Lincoln that plaintiff purchased from Suburban, our review of the trial justice's finding that plaintiff was a buyer in the ordinary course of business is dispositive of plaintiff's right to possess the car. *See In re Dexter Buick-GMC Truck Co.,* 2 B.R. 253, 254–55 (D.R.I.1980). The defendant is correct in asserting that plaintiff had the burden of proof on this point. *See* Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code (and Related Matters),* 1974 Wis.L. Rev. 1, 31–32 (1974). The defendant argues that the facts contained in the record do not support the trial justice's finding that plaintiff was a buyer in the ordinary course of business.

The defendant's primary contention is that plaintiff was not a "buyer." This argument is based on the proposition that no "sale" had occurred because the dealer retained title to the Lincoln and possession of

---

**3.** By "serial number" test, we mean the pre-UCC notion that collateral be described precisely. Many courts, particularly in chattel mortgage cases, required that an accurate serial number be listed for each item of collateral

covered by a creditor's interest. *See, e.g., Master Loan Service, Inc. v. Maddox,* 68 Ga.App. 429, 433–34, 23 S.E.2d 179, 181–82 (1942); *Wise v. Kennedy,* 248 Mass. 83, 85, 142 N.E. 755, 756 (1924).

the car pending receipt of the outstanding balance from plaintiff. Of course, in *Holstein v. Greenwich Yacht Sales, Inc.,* R.I., 404 A.2d 842 (1979), this court held that an individual could become a buyer at the time goods to a contract are identified. Identification often occurs prior to the passage of title and delivery of the items to the purchaser.

▮ The defendant, however, suggests that we should reconsider *Holstein.* We are of the opinion, however, that our decision in that case was consistent with the notion that at the time of identification the purchaser acquires a " 'special property * * * interest' which may arise before the passage of title or the seller's delivery of the goods." *Holstein,* R.I., 404 A.2d at 844 (quoting § 6A–2–501). We are not persuaded by the rationale and supporting authority that defendant employs in urging us to reconsider *Holstein.* We reiterate today what we set forth in that case. A secured party's

> "[r]eliance on a debtor's possession of inventory has its risk. * * * The identification approach requires inventory financiers to become better acquainted with the inventory and marketing practices of their borrowers. *The risk of loss in such situations quite properly should be on the lender rather than on the buyer."* *Id.,* 404 A.2d at 845. (Emphasis added.)

Accordingly, defendant's assertion that plaintiff was not a buyer is without merit.

▮ The defendant contends further that the evidence introduced at trial did not support the trial justice's implicit findings that plaintiff acted in good faith, did not know that the sale was in violation of a term in the security agreement, and purchased the Lincoln in the ordinary course of Suburban's business.[4] In essence, defendant is rearguing the facts of the case on appeal. We refuse to engage in this form of review. Rather, we are of the opinion that the trial justice, after considering all of the evidence and exercising his independent judgment concerning its weight and credibility, was correct in finding that plaintiff was a buyer in the ordinary course of business. As such, plaintiff is entitled to possession of the 1979 Lincoln.

The plaintiff conceded at trial, however, that he still owes approximately $2,800 of the vehicle's purchase price. The trial justice determined that this money was owed to Suburban and that there was no contention that plaintiff owed defendant any money. This statement is not entirely accurate because during the trial defendant moved to amend its answer to add a counterclaim for damages in the amount of $2,844.76. The trial justice, however, denied the motion. We must now address the propriety of this denial.

## II

Denying defendant's motion to amend, the trial justice characterized it as a com-

---

4. Another of defendant's contentions is intertwined with defendant's claim that plaintiff did not prove that he acted in good faith when he purchased the Lincoln from Suburban. At trial, counsel for defendant asked DeMarco whether plaintiff had agreed to the inclusion of the Lincoln in Suburban's inventory after the sale. DeMarco responded:

   "I wasn't listening. I'm sorry. I don't know. I'll have to hear the question again."

   The trial justice then intervened and stated for the record that "I don't know" was DeMarco's answer.

   Asserting that this line of questioning was relevant to the material issue of plaintiff's good faith, defendant characterizes the trial justice's "evidentiary ruling" as an abuse of discretion that amounts to reversible error. The defend-

ant's attorney, however, never objected to the trial justice's statement. This court will not address challenges to evidentiary rulings that are raised for the first time on appeal. *Padula v. Machado,* R.I., 416 A.2d 1184, 1188 (1980). We therefore refuse to address the merits of defendant's contention on this point.

   In any event, the record indicates that defendant's attorney eventually questioned plaintiff concerning his knowledge of Suburban's inclusion of the Lincoln in its inventory from January 1979 to February 1980. He testified that he did not know about it. This testimony demonstrates that defendant had ample opportunity, apart from DeMarco's testimony, to uncover any arrangement that plaintiff and Suburban might have agreed to regarding the dealership's inclusion of the car in its inventory.

pulsory counterclaim under Rule 13(a) of the Superior Court Rules of Civil Procedure. In his brief plaintiff of course argues that the denial of the motion was an appropriate exercise of discretion but asserts that the counterclaim was permissive. In support of this contention, plaintiff asserts that his complaint arose from Suburban's sale of the Lincoln to him but that defendant's counterclaim arose from its claim to any money that Suburban owes defendant. Suburban, however, is insolvent, and its business affairs are being conducted by a receiver. Moreover, among the items of collateral to which defendant's perfected security interest attached were Suburban's accounts receivable, inventory and the proceeds from the sale of items included in Suburban's inventory.

The event that precipitated the filing of plaintiff's complaint was defendant's repossession of the 1979 Lincoln and Suburban's other inventory when the dealership defaulted on its obligations. The plaintiff alleged that the seizure and continued possession was wrongful and accompanied its complaint with a motion for the issuance of a writ of replevin. The defendant contended at trial that its action was consistent with its rights as a secured creditor. The counterclaim that defendant attempted to assert, if litigated, might have resulted in defendant's demonstrating that even if it could not keep the vehicle itself, it had a right to the outstanding balance on the vehicle because that money either was included in Suburban's accounts receivable or constituted proceeds from the sale of an item in Suburban's inventory. Regardless of the theory that defendant might have used, its claim to the outstanding balance clearly arose from the same "transaction or occurrence" that served as the basis for plaintiff's complaint, namely, Suburban's default and defendant's subsequent exercise of its rights under the security agreement. *Cf. Abedon v. Providence Redevelopment Agency,* 115 R.I. 512, 514, 348 A.2d 720, 721 (1975) (when the plaintiff was the receiver of an insolvent corporation, the defendant's

counterclaim arose from the same transaction that was the subject of the receiver's complaint). The counterclaim, therefore, was compulsory in nature. Thus, if this court upholds the trial justice's denial of defendant's motion to amend, defendant will never again be able to litigate its claim to the outstanding balance due on the Lincoln. *See* 1 Kent, *R.I.Civ.Prac.* § 13.3 at 129 (1969).

Although defendant's counsel did not expressly articulate the procedural vehicle for her motion to amend, we find that it was Rule 13(f). That rule provides:

"When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, *or when justice requires,* he may by leave of court set up the counterclaim by amendment." (Emphasis added.)

The trial justice, however, apparently interpreted the motion as one within the purview of Rule 15(a). The following provisions of that rule could be relevant to a midtrial attempt to amend a pleading:

"[A] party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. * * * A party shall plead in response to an amended pleading * * * within ten (10) days after service of the amended pleading * * * unless the court otherwise orders." Super.R.Civ.P. 15(a).

Because plaintiff objected to the motion to amend, the trial justice posited that defendant's "chances of getting [plaintiff's] written consent * * * are very slim." The defendant's attorney moved to amend the answer on June 30. Noting that the court's term ended on July 3, the trial justice found that "the practicalities of the situation" precluded a continuance. He therefore denied the motion. After this ruling, counsel for defendant requested that the trial justice clarify his reasons for denying the motion. He answered that under Rule 13(a) "a compulsory counterclaim * * * must be stated in the answer or is lost forever." The defendant's attorney, however, persist-

ed in her challenge to the ruling. She inquired:

> "[Y]our Honor, isn't that one reason in the interest of justice, the answer should be allowed to be amended if it is forever lost to the defendant to assert the right to collect this money?"

At this juncture, the trial justice, having already ruled, cut off further discussion about the motion.

Although we do not condone counsel's attempt to transform the courtroom into a platform upon which she could debate with the trial justice, we answer her inquiry in the affirmative. As Professor Kent points out, when an omitted counterclaim is compulsory in nature, justice requires that it be allowed by amendment under Rule 13(f) even if the omission was through inexcusable neglect, as long as the opposing party would not be prejudiced by such an allowance. 1 Kent, § 13.8 at 133–34.

In this case plaintiff would not have been prejudiced by allowance of defendant's motion to amend. As his testimony indicates, plaintiff was well aware that he owed over $2,800 of the Lincoln's purchase price. Indeed, before the case was placed on the trial calendar, an order was entered, pursuant to the written stipulation of the parties, that directed plaintiff to pay $2,844.76 to defendant in return for possession of the vehicle. Even though defendant's counterclaim should have been presented in defendant's answer, plaintiff should have been prepared to litigate the counterclaim at the time of trial. If he determined that it was necessary, the trial justice could have granted plaintiff a brief continuance to enable plaintiff to prepare his defense to the counterclaim more thoroughly. *See* Super.R.Civ.P. 40(b).

As we have indicated, the trial justice's rationale for denying defendant's motion to amend was based upon an application of the provisions of Rule 15(a). Because we have determined that the motion should have been granted under Rule 13(f), it is unnecessary for us to review this rationale exhaustively. We note, however, that this court has consistently held that trial justices should liberally allow amendments to the pleadings. *See, e.g., Kenney v. Providence Gas Co.,* 118 R.I. 134, 140, 372 A.2d 510, 513 (1977); *Ricard v. John Hancock Mutual Life Insurance Co.,* 113 R.I. 528, 540, 324 A.2d 671, 677 (1974); *Wilkinson v. Vesey,* 110 R.I. 606, 633–34, 295 A.2d 676, 692 (1972). *See generally* 1 Kent, § 15.3 at 151–52 (discussing provision of Rule 15(a) that leave to amend "shall be freely given when justice so requires" and citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 226 (1962)). Moreover, when an amendment to the pleadings is allowed under Rule 15(a), if the time has passed within which the responding party was required to respond to the original pleading, the trial justice must grant the responding party ten days to reply "unless the court otherwise orders." Under the facts of this case, the trial justice feasibly could have allowed the amendment under Rule 15(a) and granted a continuance even though there were fewer than ten days remaining in the court's term. Indeed, a continuance of several hours would have been more than adequate because plaintiff was aware that there was an outstanding balance on the car and that defendant had previously claimed this money.

We hold that the trial justice was in error in denying defendant's motion to amend. Accordingly, we remand the case for consideration of defendant's counterclaim. Before we issue our mandate, however, we must address the propriety of the trial justice's award of punitive damages to plaintiff.

### III

In *Sherman v. McDermott,* 114 R.I. 107, 108–09, 329 A.2d 195, 196 (1974), this court held that

> "[w]hether [the] facts are adequate to support an award of punitive damages is a question of law for the court to decide

"* * * [and] is left to the *discretion* of the trier of fact."

The *Sherman* court reiterated the principle that punitive damages may be awarded when the offending party's actions are so willful, reckless, or wicked that they amount to criminal conduct. *Id.* at 109, 329 A.2d at 196. The trial justice in this case purported to apply these standards in awarding punitive damages to plaintiff. We find that this was an abuse of discretion because, as a matter of law, the facts do not support such an award.

The trial justice based the award on the finding that defendant knew at the time it repossessed the Lincoln that Suburban had previously sold the car to plaintiff and that defendant had nonetheless placed the car on Colony's lot, thereby depriving plaintiff of the use of his property. Mr. DeMarco, who remained as general manager of Suburban almost until the dealership was placed into receivership, testified that the Lincoln was placed in the dealership's inventory because Suburban lacked the money "to pay off" the car to defendant. He testified that defendant would assume that the car had not been sold if it was listed in the dealership's inventory and admitted that from January 1979 to February 1980 he neglected to inform defendant that the car had been sold to plaintiff.

Obviously, once Suburban defaulted on its obligation to defendant and was placed into receivership the dealership's business records would indicate to defendant that the car had been sold to plaintiff. We have held, however, that the Lincoln, as part of Suburban's inventory, was covered by defendant's perfected security interest. The defendant was therefore acting according to what it perceived were its legitimate possessory rights when it seized the car and stored it on the premises of its agent. It would be unreasonable for this or any court to expect defendant to hand the car over to plaintiff, despite his willingness to pay the balance due, when the records of the dealership reflected a business arrangement concerning which defendant had previously known nothing and when the legal rights of the parties were unclear. In any event, after the facts were fully disclosed to defendant, it entered into a consent order with plaintiff providing for return of the automobile upon payment of the balance due. For reasons that are not entirely clear, plaintiff decided not to comply with this agreement and order. It was this decision that precipitated the trial in the case.

We are therefore of the opinion that the trial justice erred in finding that the defendant engaged in willful, reckless, or wicked conduct that amounted to criminality. Accordingly, we hold that the trial justice's award of punitive damages to the plaintiff was an abuse of discretion.

For the reasons stated, the defendant's appeal is denied in part and sustained in part. The portion of the trial justice's order that awarded punitive damages to the plaintiff is vacated. The case is remanded to the Superior Court for consideration of the defendant's counterclaim.