GREATER PROVIDENCE DEPOSIT
CORPORATION

v.

Joel JENISON et al.

No. 82–91–Appeal.

Supreme Court of Rhode Island.

Dec. 20, 1984.

Keven A. McKenna, Providence, for plaintiff.

Joseph F. Penza, Jr., Providence, for defendants.

OPINION

KELLEHER, Justice.

The record of this Superior Court litigation reveals evidence of a fraudulent and involuntary transfer of property as well as threats of violence which, in turn, effectuated payment of usurious loans. One of the defendants, Armand Quaranto (Quaranto), is before us on an appeal in which he challenges an award of punitive damages that were assessed against him.

The record indicates that in December 1975 plaintiff, Greater Providence Deposit Corporation (Greater Providence), instituted suit against Joel W. Jenison (Jenison) to recover the value of its security interest in a yacht purchased by Jenison in early October 1972. The yacht, which is described as a forty-three-foot Egg Harbor Sport Fisherman, was named *Serpe IV.*

Jenison, with an eye toward tax saving, went to New Hampshire and there incorporated Jodi Marine, Inc., and apparently transferred whatever interest he had in the boat to the newly formed corporation. In February 1973 Jenison, as president of Jodi Marine, Inc., applied to the Coast Guard for permission to change the name of the yacht from *Serpe IV* to *Jodi.* The application was approved on or about February 20, 1973. Greater Providence was never notified about the New Hampshire transaction or the name change.

Beginning in June 1973, Quaranto advanced a series of loans to Jenison. The first loan was for $15,000 and others varied from $5,000 to $30,000. The record indicates that Quaranto applied a novel twist to the variable-interest-rate concept when it came to computing the interest to be paid by Jenison; that is, Quaranto charged interest at a rate of 1 percent per week, but this modest rate accelerated to 2 percent per week if payments were late or if the principal owed exceeded $100,000. Within a period of seven months, Jenison owed Quaranto at least $104,000 and was experiencing considerable pressure from Quaranto to pay the debt.

The record also discloses that sometime in January 1974 Jenison went to Florida. Before the departure, however, at some point between Christmas 1973 and New Year's Day 1974, Jenison and his wife and Quaranto and his wife had dinner in East Greenwich at the Jenison home. After dinner a discussion ensued about Jenison's relinquishing his interest in the yacht as partial payment of his debt.

After examining a variety of documents, including a copy of Greater Providence's promissory note, security agreement, and financing statement, Quaranto was of the belief that the bank had not perfected its security interest.[1] Consequently, he conferred with his attorney, who then drafted a purchase-and-sale agreement for the purchase of all the stock of Jodi Marine, Inc., the sole asset of which was the yacht, *Jodi.* The purchase price was $50,000. The agreement was backdated to July 26, 1973,

---

1. Greater Providence had perfected its security interest in the yacht in conformity with the applicable provisions of the state's codification of the Uniform Commercial Code. However, the yacht was at all relevant times an enrolled vessel subject to the Ship Mortgage Act, 1920, 46 U.S.C.A. §§ 911–984 (1975). Notice of Greater Providence's security interest had not been filed with the collector of customs of the port of documentation as required by the act. It was upon this inadvertence that Quaranto apparently grounded his belief that the bank had not perfected its security interest. Admittedly, § 9–104(a) of the Uniform Commercial Code specifically provides that the code shall not apply "to a security interest subject to any statute of the United States, to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property." The trial justice was well aware, however, that this exclusion applies only "to the extent" that the Ship Mortgage Act, 1920, "governs the rights of parties." 46 U.S.C.A. § 921(a) applies to all encumbrances on federal-

ly documented vessels and provides that unless recorded with the collector of customs of the port of documentation, they shall not be valid against any person other than the grantor, mortgagor, heir, or devisee or a person having actual notice thereof. Consequently, the trial justice ruled that since Quaranto was well aware of Greater Providence's security interest in the yacht, he gained no benefit from the recording requirement of the Ship Mortgage Act. *See Jackson v. Inland Oil and Transport Co.,* 318 F.2d 802, 809 (5th Cir.1963); *Security Bank of Oregon v. Levens,* 257 Or. 630, 633, 480 P.2d 706, 708 (1971). Parenthetically, it should be pointed out that Rhode Island's version of § 9–104(a), to wit, G.L. 1956 (1969 Reenactment) § 6A–9–104(a) (1984 Cum.Supp.), apparently contains a typographical error in that when speaking of a federal statute, it states that such statute governs "the rights of parties to the third parties." Obviously, somewhere in the legislative process the word "the" was substituted for "and."

and falsely recited that Quaranto had made payments for the stock in August, September, and December of 1973. These machinations were done for the purpose of creating the impression that Quaranto was a purchaser in good faith for value and without notice of the bank's security interest in the yacht. In consideration of the transfer, Quaranto agreed to give Jenison a $50,000 credit against his outstanding balance minus any legal expenses incurred in defending against any claims of creditors.

Jenison thereafter defaulted in his payments to Greater Providence, which then undertook several lengthy civil suits not pertinent to the issue before us in its effort to recover the value of its security interest in the yacht. This litigation was begun in December 1975 and was marked during the ensuing two years by a series of cross-claims and counterclaims. One of the cross-claims was filed by Jenison against Quaranto.

After a lengthy trial, the trial justice reserved decision. Subsequently, judgment was entered in favor of Greater Providence against Quaranto for compensatory and punitive damages and in Jenison's favor on his cross-claim against Quaranto. When Quaranto's cross- and counterclaims were dismissed, Quaranto filed a timely notice of appeal, which he then withdrew as it applied to the amount due Greater Providence.

The trial justice awarded Jenison compensatory damages of $9,440, which represented the value of Jenison's equity in the boat at the time the stock was transferred to Quaranto, and $25,000 as punitive damages because of Quaranto's "willful, wanton, [and] malicious" conduct "in forcing the transfer of the yacht to himself" in repayment of the loans, and ordered Quaranto to return the corporate stock to Jenison. Before us the sole challenge made by Quaranto concerns the $25,000 award of punitive damages.

Quaranto does not argue that this was an improper case for the award of such damages. Instead, Quaranto contends that it was error for the trial justice to award punitive damages without record evidence of his ability to pay. Although Jenison acknowledges that ability to pay is of some importance in a suit seeking punitive damages, he argues that the burden of proof is not upon the injured party to produce evidence demonstrating the transgressor's ability to pay.

■ Despite occasional criticism and denunciation of the doctrine of punitive damages,[2] allowance of exemplary damages upon proof of willful, wanton, or malicious conduct has continued to be the rule in most jurisdictions in this country for well over a century. Recognition of the doctrine in Rhode Island goes as far back as 1890 when *Kenyon v. Cameron,* 17 R.I. 122, 20 A. 233 (1890), was decided. Since then it has been said that punitive damages are awarded not to compensate the plaintiff for his injuries but to punish the offender and to deter future misconduct. *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* R.I., 471 A.2d 189, 195 (1984). Therefore, punitive damages are proper only in situations in which the defendant's actions are so willful, reckless, or wicked that they amount to criminality. *Serra v. Ford Motor Credit Co.,* R.I., 463 A.2d 142, 151 (1983).

■ Whether adequate facts exist to support an award of punitive damages is a question of law for the court to decide. *Sherman v. McDermott,* 114 R.I. 107, 108, 329 A.2d 195, 196 (1974). Once the court has determined the case to be a proper one for punitive damages, whether the plaintiff is entitled to such an award is discretionary upon the finder of fact. *Scully v. Matarese,* R.I., 422 A.2d 740, 741 (1980).

Over a half century ago this court observed that the ability of a defendant to

**2.** In *Fay v. Parker,* 53 N.H. 342, 382 (1873), exemplary damages were denounced as "a monstrous heresy * * * an unhealthy excrescence, deforming the symmetry of the body of the law."

respond is an important consideration in the awarding of punitive damages. *Norel v. Grochowski*, 51 R.I. 376, 377, 155 A. 357, 358 (1931). Quaranto relies on this holding to support his contention that consideration of his financial condition was not only relevant but indispensable in determining the size of the punitive award. He obviously believes that it was Jenison's burden to prove his adversary's ability to pay.

Such a construction of *Norel* overlooks the later interpretation of that decision in *Sherman v. McDermott.* There we said:

"The case [*Norel*] did not hold that proof of ability to pay the sum requested was a condition precedent to the court's holding that the case was a proper one for punitive damages, but only that on defendant's representation of an inability to pay, the court would reduce the award accordingly." *Id.* 114 R.I. at 110, 329 A.2d at 197.

██ Case law, the holding in *Sherman* aside, and logic demand that a defendant carry the burden of showing his modest means, facts particularly within his power, if he wants this matter considered in mitigation of damages. *Zarcone v. Perry*, 572 F.2d 52 (2d Cir.1978); *Vossler v. Richards Manufacturing Co.*, 143 Cal.App.3d 952, 192 Cal.Rptr. 219 (1983); *Rinaldi v. Aaron*, 314 So.2d 762 (Fla.1975); *Wagner v. McDaniels*, 9 Ohio St.3d 184, 459 N.E.2d 561 (1984). Here, Quaranto was on notice that punitive damages were being sought, and he made no effort to introduce any evidence of his modest means. Under these circumstances, we do not believe that he should now be heard to complain about their absence or paucity. In fact, the trial justice, in referring to Quaranto's financial status, observed that "[h]is means are such that he is financially able to respond to a substantial award of exemplary damages." We find nothing in the record that would cause us to doubt the truth of that statement.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.