In re Arthur REPOSA, Peter Reposa, Debtors.

Louis A. GEREMIA, Trustee, Arthur Reposa and Peter Reposa, Plaintiffs,

v.

NORTH ATLANTIC FISHING, INC. and Herbert Lee, Defendants.

Bankruptcy Nos. 85–00579, 85–00060. Adv. No. 87–0021.

United States Bankruptcy Court, D. Rhode Island.

Aug. 29, 1994.

William Y. Chaika, Chaika & Chaika, Cranston, RI, for Arthur Reposa.

Thomas H. Quinn, Jr., Quinn Schechtman & Teverow, Providence, RI, for Peter Reposa.

Louis A. Geremia, Chapter 7 Trustee, Cuzzone, Geremia & Civittolo, Providence, RI.

Stokes E. Mott, Jr., Philadelphia, PA, for defendants.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

This matter is before us again[1] on remand from the United States District Court, 153 B.R. 607, ordering us, *inter alia*, to reexamine and recalculate the compensatory and punitive damages awarded in our Decision and Order dated November 14, 1991.

### I.  BACKGROUND

#### A.  Factual History

The relevant facts stem from business dealings between the parties which began in 1984, when Arthur Reposa and his son Peter purchased the fishing vessel, *Wilfreta Lee,* from North Atlantic Fishing, Inc. ("NAF") for $665,000.  Defendant Herb Lee was then, and still is today, President and sole stockholder of NAF.  The Reposas financed the purchase by: (1) paying $14,000 in cash; (2) assuming a $270,000 mortgage held by Mellon Bank; and (3) giving NAF a note in the amount of $381,000.  The note was secured by a second mortgage on the vessel, as well as equity mortgages on both of the Reposas' homes, and on another fishing boat then owned by the Reposas.  On March 22, 1984, during the negotiations but shortly before the sale, the *Wilfreta Lee* sank at the dock and the engine room was flooded with sea water.  After this mishap, Lee represented to the Reposas that "the water had only risen to one to two inches above the lower level of the engine room," and that "no water had gotten into the engine."  Believing, and in reliance on these and other similar statements, the Reposas agreed to buy the vessel *for the asking price.*  As the evidence clearly disclosed, and as will be discussed further below, all of the material representations by Mr. Lee turned out to be intentionally and willfully misleading and fraudulent, in every sense, i.e. two months after the purchase, while at sea, the *Wilfreta Lee's* engine failed, and the vessel was towed to Marty's Marine, Inc. ("Marty's") for repairs.  Just one month later the engine failed again due to negligent repair work by Marty's, requiring additional repairs which took three more months.  The vessel's return to service this time was also short lived, however, and in July 1985 the

---

1.  These adversary proceedings were first decided in this Court on December 29, 1988.  That decision was appealed to the District Court and remanded on March 11, 1991, with instructions to recalculate the compensatory damages.  We entered our second decision on November 14, 1991.  That Order was also appealed to the District Court and remanded on May 4, 1993, with instructions to: reduce the compensatory damage; reconsider the appropriateness of a punitive damage award; determine amount of such damages if any; and to determine what other orders should enter with respect to any remaining obligation of the Reposas to NAF and Lee.  See Sect. 1.B. infra.  The time between Judge Lagueux's remand and this decision is attributable largely to the Defendants' delay in obtaining replacement counsel, and to several continuances requested by the parties for the filing of briefs.

reverse gear failed,[2] requiring yet another series of repairs. The inability of the Debtors to use the vessel to produce revenue, with so much early down time, precipitated these bankruptcies.

### B. *The Travel of this Adversary Proceeding*

In September 1985, Arthur Reposa filed a Chapter 11 petition, and his son Peter followed suit in January 1986. Thereafter the cases were administratively consolidated. On August 25, 1986, with no reorganization in sight, the cases were converted to Chapter 7. In February 1987, this Court approved a $30,000 compromise with Marty's Marine's liability insurer, in settlement of the Debtors' claim against Marty's for negligent repairs. In March 1987, the Chapter 7 Trustee received authorization to sell the vessel for $425,000, and Mellon Bank, the first secured creditor, received $314,485 from the sale proceeds.[3] NAF and Lee have filed a joint proof of claim in the amount of $423,556, but payment has been withheld pending the outcome of this adversary proceeding, wherein the Trustee alleges, *inter alia*, fraud in the inducement. At the inception of this law suit, the Reposas were joined as Plaintiffs. After a four day trial in December 1987, it was determined that Herb Lee fraudulently misrepresented the condition and extent of the damage caused to the *Wilfreta Lee* by the sinking. *Reposa v. North Atlantic Fishing, Inc. (In re Reposa)*, Ch. 7 BK Nos. 85–00579, 85–00060, A.P. 87–0021, slip op. (Bankr.D.R.I. Dec. 29, 1988).

The issues tried and determined at that time were: (1) the nature of the Defendants' liability to the Reposas; and (2) with liability established, the damages to be assessed. *Id.* at 3. At the conclusion of the trial Lee and NAF were held jointly and severally liable to the Reposas, in the amount of $22,125, as compensatory damages, for losses sustained as a result of the first engine failure. *Id.* at 14. In addition, we assessed punitive damages in the amount of $160,000 for Herb Lee's intentionally fraudulent misrepresenta-

tions. *Id.* at 15. The end result was that NAF'S proof of claim was reduced from $423,556 to $241,431, plus accrued interest. *Id.* at 16.

All parties appealed that decision. The Trustee and the Reposas sought to increase the punitive damage award to an amount sufficient to offset the remaining indebtedness to NAF, arguing on appeal that the Bankruptcy Court should have declared, as void: NAF'S promissory note; the second preferred ship's mortgage; and the home equity mortgages. On the other hand, NAF and Lee challenged our awards of both compensatory and punitive damages, as excessive.

Also in our first decision, we ruled that the liability of NAF and Herb Lee was cut off as to damage sustained after Marty's negligent repair work, as unforeseeable, and that the exposure of the Defendants thereafter was limited by Marty's intervening negligence. On appeal, the District Court affirmed our factual finding of fraud, but reversed on the damage issue, holding that Marty's negligent repair work, and the damages flowing therefrom, were a reasonably foreseeable consequence of Lee's fraudulent misrepresentations, *In re Reposa*, C.A. Nos. 89–682P, 89–683P, slip op. at 9, 1991 WL 519626 (D.R.I. March 11, 1991), and remanded with instructions to recalculate the compensatory damages. *Id.* at 17. In that decision, Judge Pettine did not issue specific instructions regarding punitive damages, but he did invite the Bankruptcy Court, on remand, to review its punitive damage assessment, in light of his order to increase the compensatory damages. *Id.* at 13. On November 14, 1991, in response to what we understood to be the letter and spirit of Judge Pettine's remand order, we increased the compensatory damages from $22,125 to $89,395, and increased the punitive damage award from $160,000 to $334,160. *Reposa v. North Atlantic Fishing, Inc. (In re Reposa)*, 155 B.R. 809, 811 (Bankr.D.R.I.1991).

---

**2.** This mishap, in fairness, may not be attributed to Herb Lee in any way.

**3.** This amount represented full payment of the outstanding principal and interest due Mellon Bank.

A second appeal followed with NAF and Lee arguing that the compensatory damages be reduced, and that the award of punitive damages be either vacated or substantially reduced. Additionally, the Defendants sought payment of their claim from the proceeds of the sale of the vessel, and requested permission to foreclose on the Reposas' homes. The Trustee and the Reposas urged the District Court to affirm our November 14, 1991 decision.

On May 4, 1993, Chief Judge Lagueux of the District Court entered decision on the second appeal. He ordered that the compensatory damage award be reduced from $89,395 to $59,395, on the ground that $30,000 paid by Marty's liability insurer to the Reposas should, as a matter of law, be subtracted from the award, in accordance with the Uniform Contribution Among Joint Tortfeasors Act, R.I.Gen.Laws 1956 (1985 Reenactment) Ch. 10–6.

In addition, we were instructed: (1) to look again at the appropriateness of a punitive damage award in the first place; and if such damages are called for, (2) to reconsider the amount of said damages; and (3) to determine what other orders should enter with respect to any remaining obligation of the Reposas to NAF and Lee.

## II. *DISCUSSION*

### A. *Compensatory Damages*

In accordance with Judge Lagueux's instructions on this issue, the Plaintiffs are awarded $59,395 in compensatory damages.

### B. *Punitive damages*

The Defendants argue that this Court should reject any request for punitive damages, based on alleged lack of malice. The Plaintiffs, on the other hand, seek punitive damages of $1,133,253 plus $25,000, an amount sufficient to wipe out Lee's proof of claim entirely.

In his remand order Judge Lagueux set forth guidelines for determining the appropriateness of, and for calculating the punitive damages. To the best of our ability we apply these guidelines, as follows:

### 1. *Whether punitive damages are appropriate, as a matter of law*

Punitive damages are awarded over and above what is necessary to compensate a party for ordinary losses, and Rhode Island permits the imposition of punitive damages in appropriate circumstances. Such damages are awarded not to compensate for injury or loss, but to punish the offender and to deter future misconduct. *Greater Providence Deposit Corp. v. Jenison*, 485 A.2d 1242, 1244 (R.I.1984) (citing *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 195 (R.I.1984); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

Moreover, punitive damages should be awarded only if the party seeking them produces "evidence of such wilfulness, recklessness or wickedness on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning of the individual, ought to be punished." *Morin v. Aetna Cas. & Sur. Co.*, 478 A.2d 964, 967 (R.I.1984) (quoting *Sherman v. McDermott*, 114 R.I. 107, 329 A.2d 195, 196 (1974)). Where it is found that the defendant acted maliciously or in bad faith, it is appropriate to award punitive damages. *Carvalho v. Coletta*, 457 A.2d 614 (R.I.1983). However, where a plaintiff "fails to even suggest in his complaint that the defendant acted maliciously a claim for punitive damages is improper as a matter of law." *Id.* at 616.

Not surprisingly, the Plaintiffs argue in response to Judge Lagueux's remand order, and based upon extensive references to the trial record, that Herb Lee acted with the requisite malice to require the imposition of punitive damages. We have also reviewed the record, in depth, and based upon our independent inquiry, conclude that Herb Lee and NAF (through Lee) did indeed act with malice, or with such reckless and wanton disregard for the truth as to amount to actual malice.

### 2. *The Evidence*

#### (a) *Misrepresentations made to the broker*

Steven Lazarus was the broker in the sale of the vessel in question, and the following

misrepresentations were made directly to him by Herb Lee: That the boat was in "good running condition," (Tr. at 10), and that there wasn't enough water taken on to make a difference. (Tr. at 11.) Lazarus was also advised that the water had not reached the top deck, (Tr. at 11), and that "the water level did not exceed the top of the bilge". (Tr. at 12.) Accepting these representations as true, Lazarus relayed this information to the Reposas. Specifically, he passed on to them Herb Lee's representations that the boat was "ship shape," and in a "ready to go" condition. (Tr. at 30.) Lazarus testified as to the importance of these representations, all of which have been found to be false, in that if the true extent of the engine immersion in sea water were disclosed to the Reposas, they would at least have been put on notice to look elsewhere or to do a comprehensive inspection and/or survey of their own, before agreeing to the purchase.

### (b) *Misrepresentations made to the Reposas*

Herb Lee also lied directly to the Reposas as to many things, i.e. he represented to Peter Reposa that the water had risen "only to just above the lower floor board in the engine room," (Tr. at 189), and "that the boat was in top condition." (Tr. at 165.) Lee also told Arthur Reposa that the boat "took on a little bit of water," which was not something he should worry about, and that they had changed the oil in the reverse gear and main engine. (Tr. at 63.) In other conversations with Arthur Reposa regarding the sinking, Lee commented "well it didn't do any damage. Nothing to worry about. Everything is in top condition." (Tr. at 67.)[4]

### (c) *Danny Lee's Testimony*

Herb Lee's representations to Arthur Reposa sharply contrast with the physical evidence and with the testimony of his son, Danny Lee, who stated that when the oil cap was pulled off and the dipstick removed, "oil and water came spurting out these spouts." (Tr. at 32.) Danny Lee admitted that the water rose to well above the lower floor boards, and that the water was 18–24 inches above the lower deck. (Tr. at 14.) When the water was pumped out and the vessel refloated, Danny said he observed a mark circling the engine room walls evidencing the height to which the water had risen, (Tr. at 37), and he also testified that his younger brother later painted over this water (or scum) line, and he believes that his father was present while that was being done. (Tr. at 38.)

As we did at the trial, we still accept Danny Lee's testimony, which supports the conclusion that his father intentionally defrauded the Reposas with a whole series of false representations that went far beyond ordinary "puffing". In addition we have Herb Lee's testimony that prior to the sale he assured Arthur Reposa that, "[y]es, we did what we were supposed to do" after the sinking. (Tr. at 134.) It is clear to this Court that Lee knew he had not taken the steps required to correct what he knew had happened to the engine, and his assertions to the contrary probably constitute perjury. Thomas Suchocki, an authorized Caterpillar marine engine dealer and servicer, advised Lee to "run the engine at high speed and at operating temperatures to blow out all of the water and salt." (Tr. at App. 53.) This would have required running the boat in open water or nudging the bow up against a mud bank, but because Lee had only dockside insurance coverage and could not do the necessary engine run up while tied to the dock, he ignored this critical admonition, and decided to forego the operating temperature run up.

A number of other blatant misrepresentations were elicited during Lee's deposition testimony. For instance, he testified that the engine was water tight and that no sea water had gotten into it, (Tr. at 144), and that there could be no corrosion since salt water had not gotten into the engine. (Tr. at 144.) He also testified, contradicting his son Danny, that the scum line was only two to three inches above the lower floor board. (Tr. at 146.)

---

4. While each of Herb Lee's representations, viewed in isolation, might be dismissed as overzealous salesmanship, taken cumulatively, the conclusion that he was acting maliciously is inescapable.

In our December 29, 1988, decision we stated:

> Based on the evidence, we find that Lee falsely and knowingly assured the Reposas that, notwithstanding the flooding incident, the engine had been fully reconditioned, based upon the best advice available to him. It is obvious to us that because of pressure that was increasingly being exerted by Mellon Bank to foreclose on its first mortgage, Lee was highly motivated to downplay both the extent of the damage and the measure of repairs necessary to rectify the salt water damage. The evidence establishes that Lee was fully aware that more extensive repairs were required, than were actually done, to assure the seaworthiness of the vessel, but that he intentionally withheld said information from the Reposas. For example, the Coast Guard reported, when it was pumping out the vessel, that the water was "over the engines" and reached a height of six feet in the engine room.

*Reposa v. North Atlantic Fishing, Inc. (In re Reposa)*, Ch. 7 BK Nos. 85–00579, 85–00060, A.P. 87–0021, slip op. at 5 (Bankr.D.R.I. Dec. 29, 1988).

Our original impression as to the credibility of the witnesses and the culpability of Herb Lee is unchanged, and we reaffirm our initial conclusion that he acted willfully, recklessly, and maliciously in making many false representations to the Reposas regarding the condition of the vessel, to induce them to purchase his damaged property. We reject the contention that this finding is driven by passion or prejudice, and refer the Defendants to the overwhelming supporting evidence, as the basis for our rulings. *DeLeo v. Anthony A. Nunes, Inc.*, 546 A.2d 1344, 1348 (R.I.1988), *cert. denied*, 489 U.S. 1074, 109 S.Ct. 1522, 103 L.Ed.2d 828 (1989). Accordingly, our original conclusion remains un-

changed, that the imposition of punitive damages is mandatory, on the facts before us.

### 3. Determining the Amount of Punitive Damages

■ As the District Court has stated, in determining the appropriate amount of punitive damages, a number of factors are to be considered. First, punitive damages are designed, not to compensate the victim, but to deter and to punish the wrongdoer. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. at 266–67, 101 S.Ct. at 2759–60; *Allen v. Simmons*, 533 A.2d 541, 543 (R.I.1987). In addition, Rhode Island does not require that punitive damages be directly proportional to compensatory damages.[5] *Dias v. Vieira*, 572 A.2d 877, 878–79 (R.I.1990). On the record before us, we conclude that the compensatory damage award is insufficient to serve as punishment or as a deterrent.

■ Also as pointed out by Judge Lagueux, the Defendant's ability to pay is an important element in assessing punitive damages, and accordingly we consider herein the financial condition of the Defendants. *See Restatement (2d) of Torts* § 908(2); *Emery-Waterhouse Co. v. Rhode Island Hosp. Trust Nat'l Bank*, 757 F.2d 399, 410 (1st Cir.1985); *Norel v. Grochowski*, 51 R.I. 376, 377, 155 A. 357 (1931); *Hargraves v. Ballou*, 47 R.I. 186, 191, 131 A. 643 (1926). This analysis begins with a snapshot of Herb Lee's (and NAF's) net worth at the time of trial.[6] On January 13, 1986, Herb Lee filed a secured proof of claim in the amount of $423,556 in each of these cases, and since the filing of said claim, interest has accrued. This is a very substantial asset, which constitutes a large part of Herb Lee's net worth. The promissory note is secured by mortgages on both Arthur and Peter Reposas' houses. Additionally, Lee and his wife jointly owned property in Pennsylvania which they sold for $215,000. After paying the outstanding mortgage balance of

---

**5.** This is so because the compensatory damages may sometimes be sufficient to also serve as a deterrent in cases where punitive damages are otherwise allowable. *Dias v. Vieira*, 572 A.2d 877, 878–79 (R.I.1990).

**6.** On March 10, 1994, we ruled that "[t]he record of this proceeding taken on December 14–16, 1987, is sufficient for this Court to rule on the matters remanded, and that the taking of addi-

tional evidence, either documentary or testimonial is not required." *In re Reposa*, A.P. No. 87–0021, slip. op. (Bankr.D.R.I. March 10, 1994). Assessing their net worth as of the time of trial benefits the Defendants, as the gist of Herb Lee's testimony was that his assets were diminishing, and that he was not worth nearly as much in 1987 as in prior years.

$150,000, they were left with $65,000 cash. There was also a vaguely described claim against Mellon Bank, and residential and commercial property solely in Mrs. Lee's name, which we are unable to quantify, or to determine Herb Lee's interest therein, if any. Thus, conservatively,[7] Lee's known assets at that time totaled at least $456,500 ($424,000 proof of claim, plus $23,500 (1/2 interest) of home sale), plus substantial accrued interest.

■ It is the burden of the Defendant to show, in light of his financial condition as established by the evidence, that the punitive damage award is excessive. *Greater Providence Deposit Corp.*, 485 A.2d at 1244. Considering the egregiousness of his conduct, as we have found it to be, and the fact that Herb Lee's misrepresentations were motivated by malice, we find that punitive damages in the amount of $150,000 are required and appropriate. We emphasize that this figure is arrived at based upon this Court's attempt to comply with the instructions of the District Court, the unconscionable tactics[8] of Herb Lee, and his financial status and ability to pay. With these things in mind, we think such an award will deter Mr. Lee (and others) from engaging in similar misconduct in the future, and is reasonable as punishment for his reckless and wanton disregard of the truth which, in addition to its disastrous economic consequences, was potentially life threatening to the Plaintiffs and their crews.

## III. *CONCLUSION*

Consistent, we think, with the instructions of the District Court, this Court finds that Lee's actions as described herein and at trial were done "wilfully, maliciously, and intentionally, and as such amount to criminality, which for the good of society and to serve as a warning deserve punishment." *Morin,* 478 A.2d at 967. Accordingly, we feel compelled to award punitive damages as aforesaid,

which are commensurate with the culpability of the Defendant Herb Lee, and within his ability to respond to said award. This amount, as well as the award of compensatory damages in the amount of $59,395, should be deducted from Lee and NAF's pending proof of claim.

Also in accordance with the instructions of the District Court, upon or at the Creditor–Defendants' request, we will promptly entertain a motion for relief from stay, or any other request for relief filed in these cases.

Enter Judgment consistent with this opinion.

---

7. Herb Lee's self-serving and self-described declining financial condition is not borne out by his family life style—i.e. he drives a leased Mercedes, his son attended Valley Forge Military Academy, his daughter was in Temple University, and a step-daughter in New York University. When he needs money, Lee says he borrows from his wife and his mother. Mr. Lee's version of his financial condition is not convincing, and his credibility remains at a very low ebb, in this Court's eyes.

8. The effects of Herb Lee's fraudulent sales pitch went far beyond the risk of mere financial damage to his victims, i.e., he *knowingly* put their lives in danger.