BYRON G. SHAFFER AND OTHERS v. BROOKLYN PARK GARDEN APARTMENTS AND OTHERS.

250 N. W. 2d 172.

January 14, 1977—No. 45704.

*Wurst, Bundlie, Carroll & Crouch* and *Gerald T. Carroll,* for appellants.

*Wangensteen & Associates, William K. Wangensteen,* and *Theodore Wangensteen, Jr.,* for respondent Wayzata Bank & Trust Company.

*Korengold, Jaycox, Nelson, Johnson & Gubbe, Robert G. Gubbe,* and *Jack S. Jaycox,* for other respondents.

Heard before Todd, MacLaughlin, and Yetka, JJ., and considered and decided by the court en banc.

MACLAUGHLIN, JUSTICE.

Plaintiffs, Byron G. Shaffer and Donald A. Severson, appeal from an order of the district court dissolving two temporary restraining orders and denying preliminary injunctions to prevent payment of drafts drawn under two irrevocable letters of credit[1] issued by the First National Bank of Minneapolis (First National). We reverse and remand with the instruction that the trial court issue the preliminary injunctions, pending a trial on the merits.

---

[1] Since the letters of credit in question require documentary drafts to be presented for payment, they are within the scope of Article 5 of the Uniform Commercial Code adopted in Minnesota in 1965. Minn. St. 336.5—101 et seq.

Minn. St. 336.5—103(1) provides: "In this article unless the context otherwise requires:

"(a) 'Credit' or 'letter of credit' means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this article (section 336.5—102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person *is* authorized to honor.

\* \* \* \* \*

"(c) An 'issuer' is a bank or other person issuing a credit.

"(d) A 'beneficiary' of a credit is a person who is entitled under its terms to draw or demand payment.

\* \* \* \* \*

"(g) A 'customer' is a buyer or other person who causes an issuer to issue a credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer."

Defendant Brooklyn Park Garden Apartments (Brooklyn Park), a limited partnership, was formed to construct and operate an apartment complex with defendants Larry Hork and Hork Properties, Inc., as general partners. Plaintiffs Shaffer and Severson purchased limited partnership units under an agreement providing for an initial cash payment with the balance secured by their promissory notes.

The limited partnership agreements, signed by Shaffer on April 19, 1973, and by Severson on March 8, 1973, provided that the final one-fourth of their capital contribution would be payable upon the occurrence of either of two events: 1) 90-percent occupancy of the apartment complex; or 2) the expiration of 12 months following F. H. A. endorsement of the project. On these same dates, Shaffer and Severson executed promissory notes for $84,375 and $11,250 respectively which stated that they were to be payable only upon the happening of one of the above conditions precedent.

The limited partnership agreement also provided that Shaffer and Severson would provide Brooklyn Park with letters of credit guaranteeing payment of their promissory notes, which letters of credit could then be pledged by Brooklyn Park as security for loans. On November 13, 1973, First National issued the two irrevocable letters of credit to Brooklyn Park, each providing that demand thereunder could be made on or before December 26, 1974, by presentment of a draft, accompanied by a promissory note endorsed to the order of First National and certification by Brooklyn Park that funds drawn under the letters of credit were due and payable because of the failure of Shaffer and Severson "to meet payment of authorized loans which are payable."

On November 26, 1973, Brooklyn Park signed a promissory note to Wayzata Bank & Trust Company (Wayzata), pledging Shaffer's $84,375 letter of credit as security for a $70,000 loan. On January 23, 1974, Brooklyn Park signed another promissory note to Wayzata pledging Severson's $11,250 letter of credit for

an additional loan. Wayzata loaned Brooklyn Park another $15,000 on March 5, 1974, and renewed the $70,000 loan, securing the entire amount by Shaffer's letter of credit still in their possession. These loans were renewed in April, June, and July for new promissory notes, and were at all times secured by Shaffer's and Severson's letters of credit.

By November 1974 Brooklyn Park was in serious financial difficulty. Construction had ceased, foreclosure of mechanics liens of approximately $400,000 filed against the property had begun, and, in addition, a mortgage holder threatened immediate foreclosure. Learning that the mortgage was in default, Shaffer and Severson became concerned that payment might be demanded under the letters of credit pledged by Brooklyn Park to Wayzata. Consequently, on November 7, 1974, their attorney sent a letter to Wayzata and to Larry Hork, the general partner, giving notice that demand could not be made under the letters of credit because neither of the conditions precedent to payment of the notes had occurred.

Despite the notice received from plaintiffs' attorney, Wayzata, on December 5, 1974, rewrote Brooklyn Park's notes, admittedly for the purpose of facilitating presentment for payment. Drafts were drawn by Brooklyn Park on December 24, 1974, for the amounts payable under the letters of credit and were negotiated to Wayzata. Wayzata then presented the Brooklyn Park notes and drafts to First National, along with certifications from Brooklyn Park that Shaffer and Severson had failed "to meet payment of authorized loans which are payable."

Shaffer and Severson brought this action to prevent payment of the drafts, alleging the certifications were false, and on December 26, 1974, Judge Jonathan Lebedoff issued an order restraining collection of payment by Wayzata. On December 31, 1974, Judge Bruce C. Stone issued an order restraining First National from payment of the proceeds of the two letters of credit. A hearing on the matter was held before Judge Harold Kalina on January 8, 1975, and an order issued on January 15, 1975,

denying plaintiffs' motions for temporary injunctions and dissolving both temporary restraining orders. The order was stayed pending this appeal.

The appeal raises the following issues:

(1) Whether Wayzata was a holder in due course of the letters of credit;

(2) Whether Wayzata was a holder in due course of the drafts drawn under the letters of credit, after receiving notice that certification by Brooklyn Park that the notes were payable would be fraudulent;

(3) Whether First National had an obligation to pay upon presentment of the drafts where there was notice of false certification;

(4) Whether Shaffer and Severson are likely to suffer irreparable harm if the temporary injunctions are denied.

■ The trial court found that because Wayzata had taken the letters of credit for value,[2] in good faith, and without notice of any defense against or claim to them on the part of any person, it had become a holder in due course[3] of the letters themselves. Authorities agree, however, that a letter of credit is not in itself

---

[2] "Value" is defined in Minn. St. 336.1—201(44) as follows: "* * * [A] person gives 'value' for rights if he acquires them

\* \* \* \* \*

"(b)   as security for or in total or partial satisfaction of a preexisting claim; or

\* \* \* \* \*

"(d)   generally, in return for  any consideration sufficient to support a simple contract."

[3] Minn. St. 336.3—302(1) provides: "A holder in due course is a holder who takes *the instrument*

"(a)   for value; and

"(b)   in good faith; and

"(c)   without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." (Emphasis supplied.)

However, Minn. St. 336.3—102(1)(e) defines "instrument" as follows: " 'Instrument' means a negotiable instrument."

a negotiable instrument although a draft presented under it may be.[4] A letter of credit does not fulfill the requisites of a negotiable instrument as defined in Minn. St. 336.3—104(1)[5] since it is not payable to order or bearer. Moreover, the existence of conditions precedent to payment as well as the duty of the issuing bank to reject non-complying documents take it out of the purview of an unconditional promise to pay.

Since letters of credit are not negotiable instruments, Wayzata could not become a holder in due course merely by accepting them as security for its loans to Brooklyn Park. Thus, it is necessary to determine Wayzata's rights as pledgee of the letters of credit.

Minn. St. 336.5—116[6] distinguishes between letters of credit which are expressly stated to be transferable or assignable and

---

[4] See, generally, White and Summers, Uniform Commercial Code, § 18-2; Munn, Encyclopedia of Banking and Finance (Garcia Rev. 1962) p. 401. Some cases have held that a letter of credit "partakes of the nature of a negotiable instrument," in the sense that it operates as a contract to accept bills or drafts to be drawn in the future in accordance with its terms. 50 Am. Jur. 2d, Letters of Credit, and Credit Cards, § 6. See, also, 7 Am. Jur., Bills and Notes, 224.

[5] Minn. St. 336.3—104(1) provides: "Any writing to be a negotiable instrument within this article must

"(a)  be signed by the maker or drawer; and

"(b)  contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article; and

"(c)  be payable on demand or at a definite time; and

"(d)  be payable to order or to bearer."

[6] Minn. St. 336.5—116 explains that: "(1) The right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable.

"(2)  Even though the credit specifically states that it is nontransferable or nonassignable the beneficiary may before performance of the conditions of the credit assign his right to proceeds. Such an assignment is an assignment of a contract right under article 9 on secured transactions and is governed by that article except that

"(a)  the assignment is ineffective until the letter of credit or advice of credit is delivered to the assignee which delivery constitutes perfection of the security interest under article 9 * * *."

those which are not. While the former gives the right to the assignee to execute and sign drafts which the issuer must honor, the letter of credit which is not expressly transferable gives the assignee only the right to receive drafts properly drawn by the beneficiary. Since the letters of credit issued by First National to Brooklyn Park did not expressly state that they were transferable or assignable, Brooklyn Park, by pledging the letters of credit, could not invest Wayzata with the right to draw drafts but only with the right to receive the proceeds thereunder.

Wayzata, as pledgee, had no more than a perfected security interest[7] in the right to receive the proceeds under the letters of credit by drafts properly drawn and negotiated by Brooklyn Park. Therefore, we hold that although Wayzata did give value, in good faith, and without notice of any defense or claim against the letters of credit at the time of the assignment of the right to proceeds, Wayzata did not become a holder in due course of the letters of credit.

■ Drafts, unlike letters of credit, may be negotiable and these drafts, drawn by Brooklyn Park on December 24, 1974, payable to Wayzata's order, were negotiable instruments.[8] Thus, Wayzata became a holder when it received the drafts from Brooklyn Park.[9] The essential question, however, is whether Wayzata became a holder in due course.

To be a holder in due course of the drafts which it received on December 24, 1974, Wayzata had to take them for value, in good faith, and without notice of any defense against or claim to them on the part of any person.[10] The question of value is not an issue

---

[7] Minn. St. 336.9—305 provides in part: "A security interest in letters of credit and advices of credit * * * may be perfected by the secured party's taking possession of the collateral."

[8] See, Minn. St. 336.3—104(2)(a).

[9] Minn. St. 336.1—201(20) defines a holder as "a person who is in possession of * * * an instrument * * * drawn * * * to him or to his order or to bearer or in blank."

[10] See, Minn. St. 336.3—302(1), footnote 3, *supra.*

since a holder takes an instrument for value even when taken in payment for an antecedent debt[11] and Wayzata in the past had made loans to Brooklyn Park in excess of the value of the drafts. However, it seems clear that Wayzata did not take the drafts in good faith and without notice of defenses against them because on November 7, 1974, the attorney for Shaffer and Severson gave notice to Wayzata by letter that the letters of credit were issued pursuant to specific terms and conditions. The conditions were explained and the letter warned that the conditions had not and would not be fulfilled in the foreseeable future. This was notice that any certification by Brooklyn Park that Shaffer and Severson had failed to pay loans "which are payable" might well be fraudulent. Moreover, Wayzata, having made substantial loans to Brooklyn Park, could not have been unaware of the severe financial difficulties encountered by the project and, for all these reasons, had a duty to inquire further after receiving the letter.

Good faith is defined by Minn. St. 336.1—201(19) as "honesty in fact in the conduct or transaction concerned." This court discussed the test of good faith in Eldon's Super Fresh Stores v. Merrill Lynch, 296 Minn. 130, 136, 207 N. W. 2d 282, 287 (1973):

"* * * The test requires honesty of intent rather than absence of circumstances which would put an ordinarily prudent holder on inquiry in order to constitute good faith * * *. In short, it is an issue of honesty of intent rather than of diligence or negligence. Some term it the 'white heart' test."

Under Minn. St. 336.1—201(25), "[a] person has 'notice' of a fact when (a) he has actual knowledge of it; or (b) he has re-

---

[11] Minn. St. 336.3—303 provides in part: "A holder takes the instrument for value

\* \* \* \* \*

"(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due \* \* \*."

See, also, Minn. St. 336.1—201(44)(b).

ceived a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists."[12] The Minnesota Code Comment to this section, 21A M. S. A. 76, explains that "notice" is restricted to "actual knowledge of the fact, receipt of notification of it, or knowledge of facts from which the fact in question is inferable." As was stated in Eldon's Super Fresh Stores:

"* * * [T]his court has rather consistently held that having notice by way of the 'inferable knowledge' test is something more than failure to make inquiry about an unknown fact. Failure to make such inquiry may be negligence and lack of diligence, but it is not 'notice' of what he might discover." 296 Minn. 138, 207 N. W. 2d 288.

See, also, Jeanette Frocks, Inc. v. First Produce State Bank, 272 Minn. 234, 137 N. W. 2d 205 (1965); Olsen v. Hoffmann, 175 Minn. 287, 221 N. W. 10 (1928).

In the instant case, Wayzata did not merely fail to make inquiry about an unknown fact but failed to inquire in respect to facts brought to its attention by plaintiffs' letter of November 7. If Wayzata did not already have notice by reason of its financial relationship with Brooklyn Park, it did so by virtue of the letter which it chose to disregard. Thus, we hold that by the time Wayzata received the drafts from Brooklyn Park on December 24, 1974, it could no longer qualify as a holder in due course.

■ First National's duty, as issuer of the letters of credit, to honor drafts presented for payment by Wayzata, was dependent only on the terms and conditions of the letters of credit and not on the limited partnership agreements between Shaffer and Severson and Brooklyn Park. Minn. St. 336.5—109(1)(a).[13] The

---

[12] See, also, Minn. St. 336.1—201(26).

[13] Minn. St. 336.5—109(1) provides in part: "An issuer's obligation to its customer includes good faith and observance of any general banking usage but unless otherwise agreed does not include liability or responsibility

"(a)  for performance of the underlying contract for sale or other

issuer's lack of responsibility for the performance of the underlying contract between customer and beneficiary is a policy consideration, based on the issuer's lack of control over either the underlying contract or the customer's selection of the beneficiary.[14] Although bound by the terms of Minn. St. 336.5—109(2) to examine with care the documents presented for payment, First National assumed "no liability or responsibility for the genuineness, falsification or effect of any document which appears on such examination to be regular on its face."[15]

In the instant case, First National received documents from Wayzata which appeared to comply with the presentation requirements under Shaffer and Severson's letters of credit. The certifications from Brooklyn Park that plaintiffs had defaulted on their loans, the drafts drawn by Brooklyn Park payable to the order of Wayzata, as well as the promissory notes, all appeared to be in accord with the terms of the letters of credit. Therefore, under Minn. St. 336.5—114(1), First National was obligated to honor the drafts presented by Wayzata and had no duty to inquire further into the underlying transactions.[16] How-

transaction between the customer and the beneficiary * * *."

See, also, Mentschikoff, *Letters of Credit Under the Uniform Commercial Code,* Uniform Commercial Code Handbook, A. B. A. Section of Corporation, Banking and Business Law, p. 153; Halls, *The Uniform Commercial Code in Minnesota: Article 5—Letters of Credit,* 50 Minn. L. Rev. 453; 3 Anderson, Uniform Commercial Code (2 ed.) § 5—101, et seq.; White and Summers, Uniform Commercial Code, § 18-2.

[14] See, Uniform Commercial Code Comment 1 to § 336.5—109, 21B M. S. A. 813.

[15] Minn. St. 336.5—109(2) states: "An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit but unless otherwise agreed assumes no liability or responsibility for the genuineness, falsification or effect of any document which appears on such examination to be regular on its face."

[16] Minn. St. 336.5—114(1) explains the issuer's duty to honor as follows: "An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the

ever, before the drafts were paid by First National, plaintiffs obtained temporary restraining orders by alleging that false certifications had been presented by Brooklyn Park. Such allegations of fraudulent documentation, received by First National before payment of the drafts, brought into effect the provisions of Minn. St. 336.5—114(2).[17]

Under subsection (2)(a), if presentment is made by or on behalf of one who has taken the tainted documents under circumstances which would make the presenter a holder in due course, the issuer *must* honor the draft or demand for payment, regardless of the fraud alleged. This properly places the risk of the beneficiary's bad faith upon the customer who selected him rather than upon an innocent third party or upon the issuer.[18] Subsection (2)(b), on the other hand, applies where there is

goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary * * *."

[17] Minn. St. 336.5—114(2) provides as follows: "Unless otherwise agreed *when documents appear on their face to comply* with the terms of a credit *but a required document* does not in fact conform to the warranties made on negotiation or transfer of a document of title (section 336.7—507) or of a security (section 336.8—306) or *is forged or fraudulent* or there is fraud in the transaction

"(a) *the issuer must honor the draft* or demand for payment *if honor is demanded by a negotiating bank or other holder* of the draft or demand *which has taken the draft* or demand under the credit and *under circumstances which would make it a holder in due course* (section 336.3—302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (section 336.7— 502) or a bona fide purchaser of a security (section 336.8—302); and

"(b) *in all other cases* as against its customer, *an issuer* acting in good faith may honor the draft or demand for payment *despite notification* from the customer *of fraud, forgery or other defect* not apparent on the face of the documents *but a court of appropriate jurisdiction may enjoin such honor.*" (Emphasis supplied.)

[18] See, Minnesota Code Comment to § 336.5—114(2), 21B M. S. ¡A. 828; 3 Anderson, Uniform Commercial Code (2 ed.) § 5—114:8; Annotation, 35 A. L. R. 3d 1404, 1411; Banco Espanol de Credito v. State Street Bank & Trust Co. 409 F. 2d 711 (1 Cir. 1969).

forged or fraudulent documentation but where the presenters of drafts are *not* holders in due course. In the latter circumstance, an issuer may, but is not required to, honor the draft on presentment, and a court of appropriate jursidiction may enjoin honor.[19]

By seeking an injunction where it is appropriate under that statute, a customer relieves the issuer of the necessity of making a factual determination under difficult circumstances. This shifts the decision-making burden to the court which must balance the desirability of protection of the customer from the beneficiary's fraud against maintenance of the letter of credit as a commercial instrument and business device. See, generally, Kozolchyk, Commercial Letters of Credit in the Americas, § 14.01. It should be noted that where injunctive relief is sought, the fraud alleged must be in respect to the documents presented and not as to the underlying transaction. The allegation of fraud made by Shaffer and Severson is appropriate for injunctive relief since it concerns the certifications by Brooklyn Park presented by Wayzata.

Not only is this a case of first impression in Minnesota, there is little precedent elsewhere concerning letters of credit to assist or guide a court in the application of Minn. St. 336.5—114(2) (b), where injunctive relief is a matter of judicial discretion. Those few cases which have dealt with the appropriateness of the issuance of an injunction against honor of a letter of credit have been decided on narrow grounds.

An often cited pre-Code case, Sztejn v. Schroder Banking Corp. 177 Misc. 719, 31 N. Y. S. 2d 631 (1941), concerned an international sales transaction in which a buyer caused a letter of credit to be issued to a seller to secure payment for a quantity of bristles with payment to be made upon presentment of certain documents. The steamship invoices and the bill of lading com-

---

[19] See, 50 Am. Jur. 2d, Letters of Credit, and Credit Cards, § 22; 3 Anderson, Uniform Commercie Code (2 ed.) §§ 5-114:8, 5-114.9; 42 Col. L. Rev. 149.

plied with the terms of the letter of credit when presented for payment by a third party, but the buyer brought an action seeking an injunction against the issuer's honor of the letter of credit alleging that the seller had filled the shipping cartons with cowhair and had delivered for collection documents which were fraudulent, even though regular on their face.

The court in Sztejn stated that although a letter of credit is independent of the primary contract of sale between the buyer and the seller, and a bank is not obligated to go behind documents presented for payment before honoring drafts drawn under the letter of credit, the application of this doctrine presupposes that the documents accompanying the drafts are genuine. However, the court said that injunctive relief might be granted where the seller's fraud has been called to the issuer's attention before the draft has been paid, since the principle of the independence of the bank's obligation under the letter of credit should not be extended to protect an unscrupulous beneficiary. Because this was not a mere controversy between buyer and seller regarding the quality of merchandise, but a question of fraudulent documents where the issuer had received notice of this fact before paying the draft, and the presenter was not a holder in due course, the court stated that injunctive relief could be sought.

In Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank, 356 F. Supp. 991 (N. D. Ga. 1973), the procurer of a letter of credit sought a preliminary injunction pending the outcome of its prayer for permanent relief. The district court held that if the beneficiary's certificate, presented to the bank for payment, was fraudulent, the plaintiff would be entitled to an injunction permanently restraining the bank from honoring the letter of credit and further held that plaintiff's application for preliminary injunctive relief would be granted.

The court observed:

"* * * [T]he factors a court must take into consideration in weighing an application for such an injunction are the relative importance of the rights asserted, the nature of the acts to be

enjoined, the relative hardships that would result if the application were granted or denied, the applicant's probability of ultimate success, and the public interest." 356 F. Supp. 999.

Since the deposit was currently earning daily interest in the hands of the bank and was a large sum to which all parties attached great importance, an injunction would merely require the bank to continue holding the deposit, while if plaintiff's application were denied, the deposit would be lost as would plaintiff's remedy. The court concluded:

"* * * It appears to the court that plaintiff has at least a decent chance of winning this suit, and there is as much public interest in discouraging fraud as in encouraging the use of letters of credit. Accordingly, the court concludes that a preliminary injunction is warranted." 356 F. Supp. 1000.

In the instant case, First National, because of the commencement of this action, received notice of plaintiffs' allegations of false certification prior to the time payment had been made on the drafts. Therefore, because Wayzata was not a holder in due course, the trial court had the discretion to grant temporary injunctive relief. The only remaining question is whether the trial court abused its discretion in not granting such relief.

■ It seems quite clear that denial of injunctive relief will leave Shaffer and Severson with no recourse against Brooklyn Park or Wayzata. Brooklyn Park, because of admitted financial difficulties, will not be able to compensate the plaintiffs for the alleged fraudulent certification. Affirmance of the trial court's conclusion that Wayzata is a holder in due course would serve to establish Wayzata's good faith and lack of notice, thereby precluding any remedy the plaintiffs might have for bad faith presentment.

This court has held that a temporary injunction should be granted when it appears that a party's rights will be irreparably injured before a trial on the merits or where it is shown that the relief prayed for in the main action will be ineffectual or impos-

sible to grant in the absence of temporary injunctive relief. The conduct to be enjoined must threaten real, substantial, and irreparable injury to a party's rights and such injury should tend to make the ultimate judgment sought in his favor ineffectual. Thompson v. Barnes, 294 Minn. 528, 200 N. W. 2d 921 (1972).

In Dahlberg Brothers, Inc. v. Ford Motor Co. 272 Minn. 264, 137 N. W. 2d 314 (1965), this court stated five factors to be considered by an appellate court in deciding whether to reverse or affirm the grant or denial of temporary injunctive relief by a trial court. The following considerations were held to be relevant: (1) the nature and background of the relationship between the parties pre-existing the dispute giving rise to the request for relief; (2) the harm to be suffered by the plaintiff if the temporary restraint is denied as compared to that inflicted on the defendant if the injunction were to issue pending trial; (3) the likelihood that one party or the other would prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief; (4) the aspects of the fact situation, if any, which permit or require consideration of public policy expressed in state and Federal statutes; and (5) the administrative burdens involved in judicial supervision and enforcement of the temporary decree.

Furthermore, the general rule is stated in 43 C. J. S., Injunctions, § 17, as follows:

"* * * [A] temporary injunction usually should be granted where the questions presented are grave and injury to the moving party will be certain, substantial, and irreparable if it is denied and the final determination is in his favor, while if it is granted and the decision is unfavorable the inconvenience and loss to the opposing party will be inconsiderable or may be adequately protected by a bond * * *."

Based upon all of these considerations, we have concluded that Shaffer and Severson will be irreparably injured if a temporary injunction does not issue before a trial on the merits, and that

without such an injunction a final determination in their favor would serve no purpose since any relief granted would be ineffectual. On the other hand, if injunctive relief is granted and Wayzata prevails in the subsequent trial, Wayzata's inconvenience and loss will be nominal since any potential loss of interest is protected by a supersedeas bond. Therefore, we reverse and remand, with instructions to the trial court to issue the temporary injunction pending a trial on the merits.

Reversed and remanded.