The EMERY–WATERHOUSE
COMPANY, Plaintiff,
Appellee,

v.

RHODE ISLAND HOSPITAL TRUST
NATIONAL BANK, et al.,
Defendants, Appellants.

The EMERY–WATERHOUSE
COMPANY, Plaintiff,
Appellant,

v.

RHODE ISLAND HOSPITAL TRUST
NATIONAL BANK, et al.,
Defendants, Appellees.

Nos. 84–1123, 84–1162.

United States Court of Appeals,
First Circuit.

Argued Nov. 9, 1984.

Decided March 11, 1985.

Carl K. King, Boston, Mass., with whom Peter S. Brooks and Goldstein & Manello, Boston, Mass., were on brief for Rhode Island Hosp. Trust Nat. Bank.

Robert J. Piampiano, Portland, Me., with whom Michael P. Boyd, Richardson, Tyler & Troubh, Portland, Me., John T. Walsh, Jr. and Higgins, Cavanagh & Cooney, Providence, R.I., were on brief for Emery-Waterhouse Co.

Before BREYER, Circuit Judge, McGOWAN,[*] Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BREYER, Circuit Judge.

The Rhode Island Hospital Trust National Bank ("Hospital Trust Bank") appeals a federal district court's findings that it acted unlawfully—indeed, that it acted wilfully, recklessly, wickedly, or criminally— when it took and failed to return $139,700 belonging to the Emery-Waterhouse Company ("Emery"). After reviewing the record with care and considering appellant's legal arguments, we conclude that the decisions of the judge and jury in this diversity case were adequately supported in fact and law. We affirm the court's award to Emery of $139,700 in actual damages and $1,397,000 in punitive damages.

I

We take the key facts to be the following: The Franklin Cast Products Company ("Franklin") imported wood burning stoves from the Orient and resold them in the Northeast. Its business grew rapidly. Hospital Trust Bank helped it finance that business by lending it several million dollars, which Franklin used for the most part to pay foreign stove suppliers. As security for these loans, Franklin gave Hospital Trust Bank rights to its accounts receivable. Franklin and Hospital Trust Bank also organized a secured lending arrangement with what are known as "back to back" letters of credit.

Under a "back to back" financing arrangement, a Firm assigns a Bank a debt that the Firm's Customer owes the Firm along with an ironclad guarantee, such as a letter of credit ($LC_1$), assuring that the Customer will pay its debt. The Bank uses the assignment and guarantee as security for an additional Bank loan to the Firm, in the form of the Bank's own letter of credit ($LC_2$), which guarantees payment when the Firm buys from the Firm's suppliers. Franklin, for example, required a typical customer, Customer X, to obtain a letter of credit from a reputable bank guaranteeing payment of Customer X's debts to Franklin up to some amount, say $300,000. Franklin assigned its rights to all Customer X's present and future payments to the Hospital Trust Bank. Suppose Customer X bought, say, an additional $10,000 worth of stoves from Franklin. Payment of Customer X's new $10,000 debt would be guaranteed under Customer X's own letter of credit, from Customer X's own bank, which letter would run in Franklin's favor. Hospital Trust Bank, then believing itself in possession of an additional $10,000 worth of security, would guarantee payment to Franklin's suppliers (via Hospital Trust's own letter of credit) of $10,000 worth of additional Franklin purchases. That is to say, Hospital Trust Bank, the assignee of Franklin's accounts receivable, now has an additional $10,000 receivable. It knows collection is assured by $LC_1$; it therefore advances Franklin an additional $10,000 under $LC_2$.

In 1981 Emery, an important Franklin customer, arranged with its own bank, First National Bank of Boston ("FNB"), to provide Franklin with the necessary letter of credit ($LC_1$) guaranteeing Emery's payment for present and future purchases. This letter guaranteed payment by FNB of up to $329,000 of Emery's debts to Franklin. The parties thought that this letter, unlike an ordinary commercial letter of

[*] Of the District of Columbia Circuit, sitting by designation.

credit, would not itself be used to pay Franklin; rather, Emery would pay its bills directly. The FNB letter was considered a "standby" letter, to be used only as a guarantee of payment, rather than as a typical or expected source of payment. The letter states that to draw upon it Franklin must present FNB with a

> signed statement certifying that the amount of your draft represents funds due you as a result of the failure of the Emery-Waterhouse Company to pay invoice(s) within its terms, that demand for payment has been made, and that payment has not been received by you from the Emery-Waterhouse Company or any other source.

After obtaining this letter, Emery continued to do business with Franklin as it had since 1979. It would buy stoves. Franklin would send an invoice for the money due. Emery would then send payment directly to Hospital Trust Bank (for it knew that Franklin had assigned Hospital Trust its accounts receivable). When Emery believed that the amount on Franklin's invoice was incorrect (if, for example, the invoice failed to show credits that Emery had obtained, say, by returning some stoves), Emery would send Hospital Trust a check for less than the full amount on the invoice. In such a case Emery would also enclose a list of deductions or credits taken and the form statement, "If correct, detach and deposit check otherwise return entire voucher." Whenever this sort of "net check" arrived, a Hospital Trust employee would verify through Franklin that the deduction was proper. The employee would then deposit the check. Hospital Trust would treat the difference between invoice and payment as an additional loan to Franklin.

In early November 1981 Franklin learned that a jury had returned a $1.4 million verdict against it in a trade infringement case. On November 9 Franklin's chief executive officer told Hospital Trust Bank officers that Franklin was finished. Hospital Trust Bank, realizing that Franklin owed it approximately $2 million, ordered one of its officers to take over Franklin. The officer hired John Donnelly (a Franklin official and a former Hospital Trust Bank employee with extensive "letter of credit" experience) to help organize Franklin's liquidation. At the same time, Hospital Trust seized Franklin's bank accounts to partly offset Franklin's debts to Hospital Trust Bank.

Hospital Trust Bank apparently decided to obtain additional money by calling upon letters of credit that named Franklin as a beneficiary. In particular, the Hospital Trust Bank told Donnelly to prepare drafts drawing down Emery's letter of credit in the amount of any outstanding invoices. Donnelly prepared three "sight drafts" for payment in Hospital Trust Bank's favor, one for about $87,000, one for about $7,000, and one for about $46,000. Donnelly, in each instance, attached a request to FNB to pay the drafts to Hospital Trust Bank and to charge Emery's letter of credit. Donnelly, in each instance, attached copies of Franklin's invoices to Emery and a certification stating,

> We hereby certify that the amount of draft represents funds due as a result of the failure of the Emery-Waterhouse Company to pay invoices within its terms, that demand for payment has been made, and that payment has not been received by us from the Emery-Waterhouse Company or any other source.

Donnelly sent these documents to FNB on November 25. His testimony makes clear that he did so reluctantly. He knew that Hospital Trust Bank's records of money owed Franklin were muddled and incomplete. He feared that Hospital Trust Bank was trying to collect money that Franklin's customers did not owe it. Donnelly testified that he told other Hospital Trust Bank officials that it was "wrong" to send the demands for payment without checking the records. He added that he signed these certificates even though he was "very sure" that they were wrong. He testified that other Hospital Trust Bank officials told him that "this is what I have to do." He said he told them that if Hospital Trust

acted in this way it would have to "take the consequences." And, he later told Franklin's Chief Executive Officer that, "I shouldn't have done it and I regret that I did it."

When FNB received the drafts, it immediately paid two of them (for $87,000 and $7,000). It held up payment of the third. At the same time, FNB notified Emery, which immediately got in touch with Hospital Trust and with Franklin's CEO, and told both that it did not owe Franklin the money. It asked Hospital Trust Bank to check its own records, Franklin's records, and Emery's records. Franklin's CEO testified that he too told Hospital Trust that Emery did not owe this money—at least not all of it. Despite this information, Hospital Trust Bank insisted that FNB pay the remaining $46,000 draft, and it refused to return to Emery any of the money it had obtained from FNB.

The question of whether FNB would honor the third draft was not resolved for some time, for Emery obtained an injunction forbidding its payment. While the injunction was in effect, Hospital Trust Bank conducted its own internal investigation as to whether Emery owed Franklin $46,000. Its investigators told Hospital Trust Bank that Emery did not owe the money. Hospital Trust Bank nonetheless continued to press for payment; and it refused to return any of the money it had previously obtained. Eventually the injunction was dissolved (on the ground that the present suit provided Emery with an adequate remedy). And, Hospital Trust Bank obtained the additional $46,000 from FNB.

Emery brought this suit in Rhode Island to get back the $139,700 that Hospital Trust Bank had obtained from FNB (which in turn had debited Emery's FNB account). Emery argued that it owed Franklin nothing. After presentation of the relevant account books and documents, the jury agreed. It concluded that Hospital Trust Bank should return to Emery the $139,700 it had taken. And, it awarded Emery an additional $2 million in punitive damages. The district court ordered a remittitur, reducing the $2 million to $1,397,000. Hospital Trust Bank now appeals.

## II

It may help to understand the legal issues raised in this appeal if we begin by characterizing the *type* of argument that Hospital Trust Bank makes here to show that it had a right to obtain and to keep the money. It obviously has an uphill battle. After all, Emery did not owe the $139,700 to Franklin. And, that fact was beyond dispute, at least as to a large part of the money and at least after Hospital Trust Bank's internal investigation. Still, Hospital Trust Bank points to various legal doctrines that, under certain circumstances, might give a seller's financer rights to receive from the buyer money that the buyer does *not* owe the seller. Such doctrines are not surprising as soon as one thinks, for example, of an ordinary check (a negotiable instrument) that a buyer might write to a seller, who might then cash it with a third party (a holder in due course). Even if the buyer discovers he owed the seller nothing, he must still cover the check, and he can look only to the seller for recovery of an overpayment. *See* T. Quinn, *Uniform Commercial Code, Commentary and Law Digest* ¶ 3–305(A)(A) (1978) (holder in due course takes instrument free from "all claims to it on the part of any person" and from all "personal" defenses "including want of consideration, nonperformance, [and] nondelivery ...") (quoting UCC § 3–305). Hospital Trust does not say that Emery's letter of credit was a "check." But it does argue that the existence of the letter of credit gives the $139,700 a special status. It says that 1) the existence of Emery's letter, under certain special "letter of credit" legal principles, gave it the right to obtain the entire $139,700 and to keep it, or 2) those principles were sufficiently unclear on this point to make the judge's submission of the "punitive damage" question to the jury legally erroneous. We consider each of these claims.

## A

■ Hospital Trust Bank's argument that "letter of credit" law allows it to obtain and to keep the $139,700 rests, at bottom, upon the commercial function of a letter of credit. The very object of such a letter is to provide a near foolproof method of placing money in its beneficiary's hands when he complies with the terms contained in the letter itself—when he presents, for example, the shipping document, or the written demand for payment, or (as here) the certification, that the letter calls for. Parties to a contract may intend a letter of credit to guarantee that a contractual dispute will wend its way towards solution with money in the beneficiary's pocket, rather than in the hands of the other contracting party. Thus, courts typically have asserted that letters of credit are "independent" of the underlying contract. And, they have recognized that examining the rights and wrongs of a contract dispute to determine whether a letter of credit should be paid risks depriving its beneficiary of the very advantage for which he bargained, namely that the dispute would be resolved while he is in possession of the money. *See Itek Corp. v. First National Bank of Boston,* 730 F.2d 19, 24 (1st Cir.1984) and authorities cited there. *See also* Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution,* 93 Harv.L.Rev. 992, 999–1001, 1011–12 (1980). These commercial facts, Hospital Trust argues, mean it was legally proper for it to receive the full proceeds of a call upon Emery's letter of credit.

We agree that these considerations normally inhibit courts from enjoining payment of a letter of credit. *See Itek Corp. v. First National Bank of Boston, supra.* But they do not allow Hospital Trust Bank to prevail here. For one thing, suppose a letter's beneficiary agrees by contract with a customer that it will not call a letter of credit (under certain circumstances). Despite judicial reluctance to examine the contract and to *enjoin* a call, a court might well *later* decide that a beneficiary's call violated its contract with its customer, and it would award the customer damages for

the contract's breach. Here there is strong evidence that Franklin and Emery made such a contract—the letter was to be used only to pay Emery's actual debts to Franklin, and it was to be called only if Emery, after demand, did not pay them. Franklin's call upon the letter, in breach of this contract, would presumably have allowed Emery to collect damages from Franklin. And, given Hospital Trust's involvement in and knowledge of the circumstances, we doubt that Hospital Trust's rights in this respect are greater than those of Franklin.

We need not elaborate upon this line of reasoning, however, for this is not even a case in which a court, recognizing a letter of credit's commercial purposes, would have refused to *enjoin* a letter of credit payment. Rather, it is a case—far stronger for Emery—in which a court injunction forbidding at least some of FNB's payments would have been proper.

A well recognized exception to the "no injunction" doctrine exists in cases of fraud. The Uniform Commercial Code states:

> Unless otherwise agreed, when documents appear on their face to comply with the terms of a credit but *a required document ... is* forged or *fraudulent or there is fraud in the transaction* (a) the issuer must honor the draft ... if honor is demanded by ... a holder in due course ...; and (b) in all other cases ... an issuer acting in good faith may honor the draft ... but a court ... may enjoin such honor.

R.I.Gen.Laws § 6A–5–114(2) (emphasis added). The facts shown here bring this case within the exception that allows injunctions.

First, a "required document" was "fraudulent." The required certification included a statement that "demand for payment" had been made upon Emery. The record reveals that this statement was false. Given the "standby" status of the letter, the "demand" requirement was critical, for it was designed to allow Emery and Franklin a chance to explore differ-

ences prior to a call. Hospital Trust Bank now suggests that we read the "demand requirement" to mean only that Franklin must send an original invoice to Emery. Such a reading, however, would make the requirement's insertion in the letter of credit redundant. Regardless, Hospital Trust Bank's counsel conceded at trial that no "demand" was made.

Second, there was "fraud in the transaction." We have previously noted that this exception recognizes the unfairness of allowing a beneficiary to call a letter of credit under circumstances where the underlying contract plainly shows that he is not to do so. And, we have held that when a beneficiary "has no plausible or colorable basis under the contract to call for payment of the letters, its effort to obtain the money is fraudulent." *Itek Corp. v. First National Bank of Boston*, 730 F.2d at 25. In this case, Hospital Trust Bank did not show even a "colorable" basis for the continued efforts to obtain, and its receipt of, the third ($46,000) payment, which it received *after* its own internal investigation revealed that Emery did not owe Franklin the $46,000. (Indeed, that investigation showed that Hospital Trust Bank had at that point collected more than even the bank's officials believed Emery owed.) Moreover, Hospital Trust's involvement in Franklin's affairs, its knowledge that the "standby" status of the letter had not been respected, its knowledge that the "demand requirement" had not been met, its failure to show any special need for urgency that might justify not notifying Emery (via a demand), its efforts at best to create a state of "self-induced ignorance" before facts that cried out for investigation, *see Shaffer v. Brooklyn Park Garden Apartments*, 311 Minn. 452, 250 N.W.2d 172, 178 (1977); 5 R. Anderson, *Uniform Commercial Code* § 3-302:31 (3d ed. 1984), *together* indicate that the initial call was fraudulent. The district court stated that Hospital Trust simply called upon all letters of credit "hugger mugger," without any effort to decide whether those calls were legitimate under the relevant, underlying contracts. This type of activity has led courts to in-voke the "fraud" exception. *See, e.g., Rockwell International Systems v. Citibank and Bank Tejarat*, 719 F.2d 583 (2d Cir.1983) ("wholesale" nature of Iranian calls on letters of credit suggests they were made "for reasons unrelated to ... performance").

Hospital Trust Bank argues that, even if the record contains facts showing a "fraudulent" document or "fraud in the transaction," we must pretend that it does not because the jury refused to find Hospital Trust Bank liable on Emery's separate charge of common law fraud. The elements of "common law fraud" as charged by Emery, however, are significantly different from the elements of fraud in the statutory letter-of-credit exception. Even if we assumed that both required some showing of a "false" statement, common law fraud as charged by Emery also requires a showing that Emery "justifiably relied" upon the false statement. *See Fournier v. Fournier*, 479 A.2d 708, 714 (R.I.1984). The jury might have found for Hospital Trust on this issue, even though it found the fraud, because it failed to find the necessary reliance. Since such a finding would explain its decision not to hold Hospital Trust Bank liable for fraud, that decision does not require us to close our eyes to the facts showing fraud within the meaning of the statute. R.I.Gen.Laws § 6A-5-114(2)(b).

■ Hospital Trust Bank makes several other arguments. First, it claims specifically that it was a "holder in due course" of a negotiable instrument (like a third party who cashes a check) and that it therefore fits within subsection (a) of R.I.Gen. Laws § 6A-5-114(2), requiring honor of a presentation of the instrument. Since the district court refused to instruct the jury on this point, in considering this argument we must reverse field and view the record facts with a friendly, not a hostile, eye. We must ask whether any reasonable juror could have found that the Bank was a "holder in due course" if given the requested instruction. *See Cross v. M.C. Carlisle & Co.*, 368 F.2d 947, 953 (1st Cir.1966).

We conclude that the jury could not have found in Hospital Trust Bank's favor. For one thing, as a matter of law, Hospital Trust Bank could not have been a "holder in due course" in respect to the letter of credit itself. Rhode Island law specifically states that a letter of credit cannot be assigned unless it "is expressly designated as ... assignable." R.I.Gen.Laws § 6A–5–116. The letter here is not so designated; and if it could not be assigned, one who receives it is not a "holder in due course." *Shaffer v. Brooklyn Park Garden Apartments*, 250 N.W.2d at 177 (pledgee of non-assignable letter of credit cannot be holder in due course of that letter). Nor do we see how Hospital Trust Bank could qualify as a "holder in due course" in respect to the "sight drafts" calling for payment under the letter. The record shows (beyond reasonable disagreement) that prior to November 25, 1981 (when FNB received the requests for payment), Hospital Trust had taken over many of Franklin's affairs. It had hired Donnelly (a Franklin official) and paid his salary. Other Hospital Trust Bank officers gave Donnelly orders. Donnelly knew that "demand" had not been made of Emery. And, Donnelly believed that Franklin's record should be checked prior to making the demand. We believe the record shows a sufficiently close relation between Hospital Trust Bank, Franklin, and Donnelly to charge Hospital Trust Bank with Donnelly's knowledge. *See Restatement (Second) of Agency* § 274 (1958) ("The knowledge of an agent who acquires property for his principal affects the interest of his principal in the subject matter to the same extent as if the principal had acquired it with the same knowledge ...."); 5 R. Anderson, *Uniform Commercial Code* § 3–302:26 (3d ed. 1984) ("In some instances, the relationship between the payee and the transferee may be such that the payee can properly be regarded as the agent of the transferee and any knowledge of the payee would then be imputed to the transferee [for the purposes of holder in due course analysis]."); *cf. Hydrolevel Corp. v. American Society of Mechanical Engineers*, 635 F.2d 118, 124 (2d Cir.1980),

*aff'd* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).

Moreover, Hospital Trust Bank conceded in its closing argument that Donnelly and Schwartz had in fact warned it that the initial drawing was wrong. This fact, along with those showing a close Donnelly/bank relationship, offers sufficient support for the district court's conclusion that the jury could not have found that Hospital Trust Bank took "demand" documents "in good faith; and ... without notice ... of any defense against ... it"—two legal prerequisites of "holder in due course" status. R.I.Gen.Laws § 6A–3–302; *see also Shaffer v. Brooklyn Park Garden Apartments*, 250 N.W.2d at 177.

Since Hospital Trust was not a "holder in due course," the cases it cites for the proposition that it could obtain, and keep, the money are not in point. It places heavy reliance upon *Decker Steel Co. v. Exchange National Bank of Chicago*, 330 F.2d 82 (7th Cir.1964)—a case in which a bank, using "back to back" letters of credit, obtained money under a buyer's letter of credit despite its knowledge of a dispute between buyer and seller. In *Decker*, however, the bank was a "holder in due course" of the letter itself (which, unlike the letter here, was assignable), and it did not know that the terms of the presentation documents failed to satisfy the letter's requirements. *Decker* does not require a "holder in due course" finding (or jury submission) here. And, without such a finding, *Decker* does not provide legal precedent authorizing Hospital Trust to keep Emery's money.

■ Second, Hospital Trust argues that Emery cannot sue to get its money back because the money belonged to FNB, not to Emery. If this argument is meant to be one of substance, rather than form, it fails, for FNB debited Emery's line of credit with FNB at the same time that it paid each letter of credit draft. Emery's money, not FNB's, has been at stake throughout. If Hospital Trust Bank's argument is meant as a purely formal technical argument, to the effect that Emery cannot bring legal

claims for "conversion" and "money had and received," Hospital Trust Bank is still wrong. Older case law suggested that an action for "conversion" of money would not lie "unless there was an obligation to return the specific or identical money ..." *Parker State Bank v. Pennington*, 9 F.2d 966, 969 (8th Cir.1925), citing *Larson v. Dawson*, 24 R.I. 317, 318, 53 A. 93, 94 (1902). More recent Rhode Island case law, however, makes clear that actions entitled "conversion" or "money had and received" can be brought to recover, for example, the proceeds of checks that a bank has cashed. *See, e.g., Fuscellaro v. Industrial National Corp.*, 117 R.I. 558, 368 A.2d 1227 (1977) (suit to recover proceeds of six checks cashed by defendant bank, based on theories of conversion and of money had and received); *see also* W. Prosser & W.P. Keeton, *The Law of Torts* § 15 at 91 (1984 ed.) (noting historical expansion of action for conversion to increasingly less tangible forms of wealth such as checks, promissory notes, and stock certificates). The cases that Hospital Trust Bank cites are not in point, for they involve a customer who went bankrupt and an issuer who paid a letter of credit with its *own* funds, becoming a creditor of the bankrupt customer. *See, e.g., Planes, Inc. v. Fairchild Aircraft Corp.*, 29 B.R. 370, 371 (N.D.Ga. 1983). Since, under those circumstances, the money at stake *in fact* was that of the issuing bank, not the customer, it is understandable why the courts would so hold.

■ Third, Hospital Trust Bank argues that, because Franklin assigned it the proceeds of the FNB letter of credit, this circuit's decision in *Michelin Tires (Canada) Ltd. v. First National Bank of Boston*, 666 F.2d 673 (1st Cir.1981), bars Emery's recovery. *Michelin*, however, is not in point. *Michelin* involved a customer who thought it owed a seller money; it paid the money to a bank, an assignee of the seller's rights to payment. The customer, claiming it had just found out it did not owe the seller any money, asked the bank for the money back. The legal issue in the case was whether a particular provision of the Uniform Commercial Code, § 9–318, sub-

jecting an assignee's rights "to ... all the terms of the contract between the [customer and seller]," meant that the bank had to return the money. This court held that this particular provision of the Uniform Commercial Code offered the customer a *defense* if the assignee sues the customer; it did not provide an offensive weapon for the customer to get back from the assignee money the customer thought it should not have paid. 666 F.2d at 680. The case before us does not involve Emery's efforts to use these words in the Uniform Commercial Code; it does not involve a customer who paid money voluntarily to an assignee; and Hospital Trust's effort to find some relevant similarity in *Michelin* is further and conclusively blocked by the court's finding there that the bank (unlike Hospital Trust) acted reasonably and in good faith. We conclude that Emery is legally entitled to $139,700.

### B

■ Hospital Trust Bank asks us to set aside the district court's award of $1,397,-000 in punitive damages, a figure that the district court reduced from the jury's award of $2 million. Hospital Trust makes three significant arguments.

First, Hospital Trust points to Rhode Island law, which allows a punitive damages award only where there is "willful, reckless, or wicked conduct ... that amounted to criminality, which for the good of society and warning to the individual ought to be punished." *Adams v. Lorraine Manufacturing Co.*, 29 R.I. 333, 71 A. 180 (1908). Hospital Trust Bank adds that the evidence was insufficient to allow the jury to find conduct that met this definition, particularly in light of the complex questions about legal rights that we have discussed in Part IIA of this opinion.

We do not agree. We here must view the record in a light most favorable to Emery, *see Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 885 (1st Cir.1978) (quoting *Dumas v. MacLean*, 404 F.2d 1062, 1064 (1st Cir.1968)), and on that view, Hos-

pital Trust took and kept at least $46,000— the amount covered by the third draft—after it knew, or plainly should have known, that the money did not belong to it. The jury might well have believed that Hospital Trust Bank knew the standby letter of credit covered only Emery's debts to Franklin and that Emery had no such debt. And the jury might have properly believed it very wrong of Hospital Trust Bank not to return to Emery at least some of the money obtained once Hospital Trust learned from its own investigation that Emery did not owe Franklin equivalent debts. The jury could have taken account of the fact that Hospital Trust Bank made no serious effort to examine Emery's accounts, despite Emery's efforts to present its records and have Hospital Trust Bank decide for itself what Emery owed Franklin. The jury might have thought that Hospital Trust Bank's "good faith" claims applied at best to only some of the $139,-700, not to all of it. Consequently, the jury could have concluded that Hospital Trust Bank's conduct amounted to a reckless, or even a knowing, retention (or perhaps obtaining) of money that did not belong to it. Such conduct is analogous to theft. And, a jury could have found such conduct particularly reprehensible when engaged in by a reputable bank, the hallmark of which is "trust."

Of course, our discussion in part IIA reveals that the question of entitlement to the money is legally complicated. Yet, Hospital Trust Bank's claim that it believed itself legally entitled to the money is no different in principle from a "claim of right" as a defense to a criminal charge of theft. *See generally* 3 C. Torcia, *Wharton's Criminal Law* § 365 (14th ed. 1980). Hospital Trust Bank was free to make appropriate "good faith" arguments to the jury under appropriate instructions; and the jury was free to accept or to reject them. Here the jury might have thought, particularly in respect to the $46,000, that Hospital Trust Bank did not act in good faith on the basis of legal theory but, rather, acted in bad faith without adequate examination of either the legal or the factu-

al merits of its position. Closer factual examination would have revealed the merits of Emery's "no debt" claims; closer legal examination would have brought to its attention the "fraud" letter of credit law exception, and its application to beneficiaries who call letters of credit (to use the district court's words) "hugger mugger." *See Itek Corp. v. First National Bank of Boston*, 730 F.2d at 25; *Roman Ceramics Corp. v. Peoples National Bank*, 517 F.Supp. 526 (M.D.Pa.1981), *aff'd*, 714 F.2d 1207 (3d Cir.1983); *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941); *Shaffer v. Brooklyn Park Garden Apartments*, 311 Minn. 452, 250 N.W.2d 172 (1977); *see generally* Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution*, 93 Harv.L.Rev. 992, 999–1009 (1980). The jury might have found that Hospital Trust Bank itself believed its right to keep the money rested upon the existence of the Emery/Franklin debt, that it did not believe in good faith that it could keep Emery's money (if it turned out that Emery owed Franklin nothing), but that it nevertheless kept Emery's money even after it found no such debts existed.

These record facts provide sufficient answer to Hospital Trust Bank's major policy argument: that allowing punitive damages here threatens the commercial usefulness of letters of credit in countless ordinary banking transactions. The record shows circumstances here that are not ordinary, and that are without commercial justification. It reveals banking practices that, one must hope, are not normal and that the law need not condone.

The cases on which Hospital Trust Bank relies—cases in which the Rhode Island Supreme Court set aside awards of punitive damages—rest upon defendant conduct less obviously wrongful than what the jury here might have found. In *Serra v. Ford Motor Credit Co.*, 463 A.2d 142 (R.I. 1983), for example, the plaintiff had bought a car, paid part of the purchase price, and left the car with the dealer. The dealer

went out of business; the defendant finance company (which had a secured interest in the car) repossessed it. The court vacated a punitive damage award against the finance company after pointing out that the company had agreed to give plaintiff the car if he paid the balance that even the plaintiff admitted he owed. In *Adams v. Lorraine Manufacturing Co., supra,* plaintiff stored sand and gravel on land that defendant bought. The defendant incorrectly believed that he had bought the sand and gravel, too, and he refused to give it to the plaintiff. The court found that the plaintiff owned the sand and gravel. But, unlike this case, the record lacked evidence that the defendant knew, or plainly should have known, that the plaintiff was entitled to the property. In fact, the defendant bought the land without knowing of plaintiff's interest.

■ Second, Hospital Trust argues that it was prejudiced significantly in the jury's eyes when the trial judge admitted into evidence a counterclaim that Hospital Trust Bank had filed against Emery. The counterclaim charged Emery with fraud, conspiracy, negligence, defamation, and intentional interference with contractual relations; and it sought $2 million damages. The trial court directed a verdict for Emery on this counterclaim. Emery then used Hospital Trust Bank's filing of the counterclaim to suggest to the jury that Hospital Trust Bank would go to inordinate lengths—including bringing baseless legal claims—to avoid giving Emery its money back.

We agree with the district court that *Smith v. Macomber,* 28 R.I. 248, 66 A. 570 (1907), shows that a pleading is admissible in Rhode Island for such a purpose. In *Smith,* plaintiff sued a police officer for assault; the officer pleaded in defense that the plaintiff was mentally unbalanced and dangerous; the jury found for the plaintiff; and the court allowed the jury to consider the officer's defensive pleading when it assessed damages. The court wrote

It is no light matter to make such accusations as are contained in the defendant's

pleas. An unsuccessful attempt to justify [defendant's actions] upon such grounds constitutes an aggravation of the original offense. It is an additional injury. Moreover, it was done after mature deliberation.... No proof worthy of the name was forthcoming to sustain either charge. Malice may well be inferred from such a failure of defense.

Hospital Trust Bank argues that *Vieira v. Meredith,* 84 R.I. 299, 123 A.2d 743 (1956), overruled *Smith,* when it held that a plaintiff, suing for defamation, could not introduce as evidence defendant's statements made in pleadings in another case. *Vieira's* holding, however, turned upon the special fact that defamation was at issue; indeed the pleading at issue constituted not just evidence of defamation, but the very defamatory act. The *Vieira* court referred not to evidence but to a special privilege under the law of defamation. It spoke of the

"rule which prevails generally in this country, namely that libelous matter in pleadings ... are absolutely privileged where the statements are material, pertinent or relevant to the issues therein...."

123 A.2d at 744 (citations omitted). *Vieira* did not mention *Smith* or that case's evidentiary holdings.

Moreover, after *Vieira,* Rhode Island's courts have allowed parties to use pleadings as evidence where relevant to issues other than defamation—for example, where a witness's credibility is in question. *See, e.g., Gormley v. Vartian,* 121 R.I. 770, 403 A.2d 256 (1979) (upholding use of plaintiff's original complaint, which he later amended, to impeach credibility of plaintiff's testimony at trial). Here, the court instructed the jury to use the counterclaim as evidence of possible malice if it found "the charges contained therein are totally frivolous and were filed without justification and in bad faith." This use of a pleading to cast light on a party's state of mind is close to using it to show credibility; such a use does not seek to create out of the pleading itself any cause of action, let

alone one like defamation, where speech is at issue. *See Vieira v. Meredith, supra;* Annotation, *Relevancy of Matter Contained in Pleading as Affecting Privilege Within Law of Libel,* 38 A.L.R.3d 272 (1971) (citing *Vieira*). Thus, the court properly admitted the pleading for the stated purpose.

Further, contrary to Hospital Trust Bank's claims, this use of the bank's pleading is consistent with Fed.R.Civ.P. 11 (authorizing sanctions against attorneys and parties who file pleadings without believing them well founded). This Rule allows a judge to impose any "appropriate saction" where misconduct is found. The Rule nowhere forbids a judge from asking the jury to decide (in an appropriate case) whether a pleading has been filed without justification and in bad faith.

Third, Hospital Trust Bank objects to portions of Emery's closing argument to the jury, which it says created prejudice. Hospital Trust Bank notes that Emery's counsel at times expressed a personal belief about the veracity of witnesses. (At one point he said, "I don't accept the testimony" of the Bank's officials; at another point he said, "I never questioned the veracity of [John Donnelly] ... at any time.") Hospital Trust Bank correctly points out that counsel ought not to express a personal belief in the veracity (or nonveracity) of a witness. *See* Model Code of Professional Responsibility, Disciplinary Rule 7–106(C)(4). But, these remarks are not so egregious a violation of the Rule as to warrant a new trial, particularly in light of the trial judge's considerable discretion in exercising supervision over counsel's remarks. *See Corbett v. Borandi,* 375 F.2d 265, 270 (3d Cir.1967); *see also Ward v. H.B. Zachry Construction Co.,* 570 F.2d 892, 895 (10th Cir.1978) ("Because the trial judge is in the best position to determine the effect that arguments of counsel have upon the jury, considerable discretion is given to the trial judge in exercising supervision over arguments of counsel."). If Hospital Trust Bank's claim here is that the district court should have given a cau-

tionary instruction, the conclusive answer to that claim is that Hospital Trust Bank failed to ask for one.

Hospital Trust Bank also argues that Emery's counsel improperly appealed to the jury's prejudicial antipathy to banks. He told the jury, for example,

> [W]ith that 1.97 billion dollars that they have in assets [a] million dollars to them is chicken feed.... In 1981 they had $12,000,000 in profit.... They don't have time for this case.... I think it's a very important case, not only to Emery-Waterhouse, who is vitally concerned, but to people who deal with banks every day. The guy in Woonsocket, the lady down in Westerly, who has a problem, and she wants them to pay attention to it. How much should you punish the Hospital Bank for their conduct? That's entirely up to you, ladies and gentlemen.... The threat of a million dollars has had no impact whatsoever to this point....
>
> .  .  .  .  .
>
> This is a case that calls for you to send a message to that [Hospital Trust] Board of Directors across the street.... Send the message to other banks in Rhode Island, and indeed, the world because this case will be reported inevitably.... If you don't stop this type of conduct right now, not only for Emery-Waterhouse, but for the lady in Westerly and the guy in Woonsocket, if you don't stop it, who will?

Hospital Trust Bank's counsel failed to object to this argument at trial, however. And, the trial court's failure to stop this argument *sua sponte* does not constitute "plain error." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256 & n. 13, 101 S.Ct. 2748, 2754 & n. 13, 69 L.Ed.2d 616 (1981); *Morris v. Travisono,* 528 F.2d 856 (1st Cir.1976). Under Rhode Island law, reference to a defendant's wealth is proper where punitive damages are sought. *Norel v. Grochowski,* 51 R.I. 376, 377, 155 A. 357 (1931); *Hargraves v. Ballou,* 47 R.I. 186, 191, 131 A. 643 (1926). Moreover, counsel is permitted to argue the need for

an award of punitive damages as a deterrent against similar conduct by this defendant or by others. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. at 266–68, 101 S.Ct. at 2759–60; *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189, 195 (R.I.1984) (punitive damages intended "to deter [defendant] *and others* from similar extreme conduct") (emphasis added). The jury could properly consider the plight of banks' ordinary clients, unable to afford counsel and litigation, who might be left without any effective remedy, were conduct of the sort here at issue allowed to continue without punishment. Counsel's remarks do not plainly exceed this legitimate argumentative purpose.

III

■ Hospital Trust Bank makes two final arguments. It claims that the district court should have instructed the jury that it could find Emery estopped from asserting its claims because Emery, in a sense, misled the Hospital Trust Bank. That is to say, Emery knew that its letter of credit said it was to pay each Franklin invoice "within its terms" and it knew that Franklin had assigned its receivables to Hospital Trust Bank. Therefore, says Hospital Trust, it should have told Hospital Trust Bank that it did not owe all the invoiced amounts; and it should have done so *before* Hospital Trust called the letter of credit.

Whatever the legal merits of the argument, it fails in the face of the undisputed record evidence that Emery did regularly inform Hospital Trust of its disputes with Franklin through its practice of sending Hospital Trust a "net check" in an amount less than the Franklin invoice. Hospital Trust's employee testified that she knew what this practice meant, and she frequently checked with Franklin to verify the deductions. Emery appears to have followed that practice with the invoices here at issue. Thus, the jury could not have found any basis for estoppel.

Hospital Trust Bank also argues that Emery has somehow waived its claims. Since Hospital Trust did not present this theory to the trial court, however, we shall

not consider it now. *Johnston v. Holiday Inns, Inc.,* 565 F.2d 790, 797 (1st Cir.1977).

IV

■ Emery cross appeals, claiming that the district court should have submitted to the jury its claim against Hospital Trust Bank for "injurious falsehood." *See Restatement (Second) of Torts* § 623A; W. Prosser & W.P. Keeton, *The Law of Torts* § 128 (1984). Emery's complaint does not assert such a claim, however; and we have found nothing in the record showing that Emery asked the court's permission to amend the complaint to add such a claim. The record does contain a handwritten note from Emery's counsel asking the judge to instruct the jury on this theory. But, it does not show that Emery objected to the judge's failure to do so after he instructed the jury. *See* Fed.R.Civ.P. 51 ("No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires ...."). Therefore, we shall not consider Emery's claim of error. *McGrath v. Spirito,* 733 F.2d 967 (1st Cir.1984).

For the reasons stated, the judgment of the district court is

*Affirmed. Costs to appellee, The Emery-Waterhouse Company.*